Ethel DOMEL and Norman
Domel, Appellants,

v.

CITY OF GEORGETOWN, Appellee.

No. 03–98–00544–CV.

Court of Appeals of Texas,
Austin.

Nov. 12, 1999.

Edward D. Small, Jackson Walker L.L.P., Austin, for appellant.

Kerry Eugene Russell, Lloyd, Gosselink, Blevins, Rochelle, Baldwin & Townsend, P.C., Austin, for appellee.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and YEAKEL.

BEA ANN SMITH, Justice.

This case presents the question of whether a governmental entity returning treated wastewater into a watercourse under permit from a state agency needs additional permission from downstream landowners. Ethel and Norman Domel live on a small farm east of Georgetown. An intermittent stream crosses their land. The City of Georgetown operates a wastewater treatment plant upstream from the Domels' property. The Domels sued the City in 1994, alleging that the value of their property was diminished by the City's discharge of treated wastewater into the stream. The trial court granted summary judgment in favor of the City on the Domels' claim that a constitutional taking resulted from their allegedly reduced property values. The two issues presented in this appeal are (1) whether the stream on the Domels' land is a watercourse belonging to the State; and (2) if so, whether the City's act of discharging treated wastewater into the stream above the Domels' property can give rise to a constitutional taking absent flooding or violations of the City's discharge permit. We will affirm the summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Domels own 185 acres of land east of Georgetown. They have lived on the property for more than fifty years, farming and raising livestock. Their property is traversed by an unnamed tributary that joins the Mankins Branch several miles downstream from the Domels' property and subsequently flows into the San Gabriel River. In recent years, Georgetown

has expanded east and a number of residential developments and commercial properties are now located near the Domels' property.

The City owns and operates the Dove Springs Wastewater Treatment Plant, located on a 7.89–acre site across County Road 102 to the west of the Domels' property. The site was originally purchased for a wastewater treatment plant by a private entity, which had been granted a permit from the Texas Water Commission in 1987 to discharge treated domestic wastewater effluent. However, the private entity never constructed a treatment plant; instead, it sold the land to the City. When the City purchased the site, the Water Commission granted the City's application to transfer the discharge permit. In 1990, the City sought to amend its discharge permit to increase the maximum daily discharge from 250,000 gallons per day to 2.5 million gallons in conjunction with its plan to build the Dove Springs Plant. The City proposed releasing the additional water into the tributary at a point less than a mile upstream of the Domels' property.

The Domels and several other neighboring landowners protested the City's request to amend its permit. One of the issues at the contested administrative hearing was whether the City should be required to pipe the effluent past the Domels' property. Both sides presented evidence in a four-day evidentiary hearing. The Domels argued that the tributary, which is dry about six months out of the year,[1] would become a flowing stream of treated effluent when the discharge began; they claimed that the changed characteristics of the stream would interfere with

their use of the land for agriculture, ranching, and recreation. The City did not take a stated position on this issue.

In a proposal for decision ("PFD"), the hearings examiner determined that the City was not required to pipe the discharge past the Domels' property, concluding that the tributary was a watercourse belonging to the State of Texas. The examiner noted that the Water Code authorizes the Commission to issue permits for the discharge of wastes into waters of the State if an applicant can show that the proposed treatment facility is capable of meeting proposed permit parameters and that the proposed discharge will maintain the quality of the water. No party contested the sufficiency of the plant design, and the examiner determined that the discharge would have no adverse effect on water quality.

The Water Commission granted the City's application to amend its permit. In its findings of fact, the Water Commission determined that a discharge in compliance with the parameters of the permit does not pose a threat to the quality of water in the state.[2] Specifically, it determined that the proposed discharge: (1) would not violate the general criteria governing stream quality set forth in volume 31, section 307.4 of the Texas Administrative Code ("T.A.C."); (2) would not cause significant degradation of water quality; (3) would not cause odors in the stream; (4) would not adversely affect water uses set out in section 307.4, namely contact recreation, public water supply, and high-quality aquatic habitat; (5) would not adversely affect water uses attributed to the tributary or to the Mankins Branch; and (6) would not cause a

1. The Water Commission classified the tributary as an intermittent stream with perennial pools. Under agency regulations, an intermittent stream is defined as "a stream which has a period of zero flow for at least one week during most years." 30 Tex. Admin. Code § 307.3(a)(21) (West 1998).

2. The permit granted to the City included the following parameters: a maximum average daily flow of 2.5 million gallons per day; 10.0

milligrams per liter (mg/l) of five-day carbonaceous biochemical oxygen demand; 15.0 mg/l of total suspended solids; 2.0 mg/l of ammonia nitrogen; a minimum dissolved oxygen concentration of 5.0 mg/l; and a chlorine residual of at least 1.0 mg/l after a detention time of at least 20 minutes. Chlorinated effluent must be dechlorinated to less than 0.1 mg/l chlorine residual.

significant increase in algal growth in the receiving waters. The Water Commission also found that the aesthetic qualities of the receiving stream would be preserved; the temperature of the discharge would not interfere with the reasonable use of the water; the proposed facility and discharge would not cause contamination of groundwater; and the tributary had sufficient carrying capacity to contain the discharge. The Water Commission concluded: "Under the facts of this case, there is no basis under the Texas Water Code or the regulations of the Texas Water Commission upon which to require Georgetown to pipe the discharge past the property of the landowners."

In October 1993, the City began operating the Dove Springs Plant and discharging effluent into the tributary. Since that time, the plant has operated continuously without violating the standards of its discharge permit. In 1997, the permit was renewed by the Texas Natural Resource Conservation Commission ("T.N.R.C.C."), the successor agency to the Water Commission.[3]

The Domels sued the City in 1994, alleging that the unnatural flow of effluent through the tributary caused a taking of or damage to their property without compensation, in violation of the Texas Constitution. *See* Tex. Const. art. I, § 17. The Domels did not allege that the City's actions caused flooding on their land[4] or violated the permit conditions; instead, they argued that the presence of the treated wastewater diminished the value of their land. The City responded that the discharge of effluent could not constitute a taking because the tributary is a watercourse, and as such is reserved by the State for public use in conserving and developing the State's water resources.

A jury trial began in 1997. The trial court granted the City's motion for a directed verdict, but then granted the Domels' motion for new trial. While the scheduled retrial was pending, the City moved for summary judgment under Rule 166a(c). Tex.R.Civ.P. 166a(c). The City's sole ground for summary judgment was a three-part theory: (1) the tributary is a watercourse as a matter of law; (2) the City's discharge of treated wastewater is an authorized public use of a watercourse in conformance with all requisites of State law; (3) therefore, the lawful discharge of effluent cannot constitute a taking or damaging of the Domels' property. The City submitted evidence supporting its claim that the tributary is a watercourse, including evidence from the hearing before the Water Commission. The trial court granted the City's motion.

The Domels raise two issues on appeal. In their first issue, they claim that the trial court erred in granting summary judgment for the City because there are genuine issues of material fact concerning whether the tributary meets the criteria for a watercourse under Texas law. In their second issue, appellants argue that even if the tributary is a watercourse and the City's discharge of effluent conforms to the permit, it does not follow as a matter of law that the City has not taken or damaged the Domels' property.

## DISCUSSION

### Collateral Estoppel

We first address the City's argument that collateral estoppel prevents the Domels from relitigating whether the tributary is a watercourse because the Water Commission already determined this issue against them. The Domels respond that the City waived this issue by failing to raise it as one of its grounds for summary judgment or anywhere in the pleadings. We agree.

---

3. For convenience, we will use the term "Water Commission" to refer to both agencies.

4. Although the Domels alleged in their original petition that flooding had occurred, this allegation was dropped in their amended petition.

■ Collateral estoppel precludes a court from considering a specific issue that has been previously litigated by the same parties in another proceeding. *See Steel v. Rhone Poulenc, Inc.,* 962 S.W.2d 613, 617 (Tex.App.—Houston [1st Dist.] 1997), *aff'd,* 997 S.W.2d 217, 42 Tex. Sup.Ct. J. 927 (Tex.1999). As an affirmative defense, collateral estoppel must be pleaded or it is waived. *See id.* (citing *Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 802 (Tex. 1994), and *Voskamp v. Arnoldy,* 749 S.W.2d 113, 118 (Tex.App.—Houston [1st Dist.] 1987, writ denied)). A summary judgment cannot be affirmed on the basis of collateral estoppel if it was not asserted as a ground for summary judgment in the trial court. *See Sysco Food Servs.,* 890 S.W.2d at 805. The City did not raise collateral estoppel anywhere in its motion for summary judgment, including its supporting brief specifically incorporated as part of the motion; we therefore hold that the City cannot raise this affirmative defense for the first time on appeal. We turn now to the question of whether the tributary is a watercourse as a matter of law.

## I. Did the City Establish as a Matter of Law That the Tributary is a Watercourse?

■ To prevail on a motion for summary judgment, a movant must establish that there is no genuine issue as to any material fact and that he or she is entitled to judgment as a matter of law. *See* Tex. R.Civ.P. 166a(c); *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex. 1995). A defendant who conclusively negates at least one of the essential elements of a cause of action is entitled to summary judgment as to that cause of action. *See Johnson,* 891 S.W.2d at 644 (citing *Wornick Co. v. Casas,* 856 S.W.2d 732, 733 (Tex.1993), and *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970)). Likewise, a defendant who conclusively establishes each element of an affirmative defense is entitled to summary judgment. *See id.* In reviewing a summary judg-

ment, we must accept as true evidence in favor of the non-movant, indulging every reasonable inference and resolving all doubts in her favor. *See id.* (citing *El Chico Corp. v. Poole,* 732 S.W.2d 306, 315 (Tex.1987)).

■ Texas law categorizes surface water into one or two general types: diffuse surface water and water in a watercourse. Diffuse surface water belongs to the owner of the land on which it gathers, so long as it remains on that land and prior to its passage into a natural watercourse. *See Turner v. Big Lake Oil Co.,* 128 Tex. 155, 96 S.W.2d 221, 228 (1936). In contrast, water in a watercourse is the property of the State, held in trust for the public. *See* Tex. Water Code Ann. § 11.021(a) (West 1988); *Goldsmith & Powell v. State,* 159 S.W.2d 534, 535 (Tex.Civ.App.—Dallas 1942, writ ref'd); *South Tex. Water Co. v. Bieri,* 247 S.W.2d 268, 272 (Tex.Civ.App.—Galveston 1952, writ ref'd n.r.e.).

The parties agree that the seminal case establishing the criteria for a watercourse is *Hoefs v. Short,* 114 Tex. 501, 273 S.W. 785 (1925). In *Hoefs,* the supreme court pronounced that a watercourse has (1) a defined bank and beds, (2) a current of water, and (3) a permanent source of supply. *See id.* at 787. The bed and banks may be "slight, imperceptible, or absent" in some instances without the stream losing its character as a watercourse. *Id.* The current of water "need not be continuous and the stream may be dry for long periods of time." *Id.* As with the Barilla creek at issue in *Hoefs,* a stream may be "intermittent as to flow" and still remain a watercourse. *Id.* at 786.

In defining the third element—a permanent source of supply—the supreme court stated: "This, however, merely means that the stream must be such that similar conditions will produce a flow of water, and that these conditions recur with some regularity, so that they establish and maintain a running stream for considerable periods of time." *Hoefs,* 273 S.W. at 788. Barilla

creek usually ran for "a day or two" after a big rain, although a light rain would run immediately off; the creek ran from one to twenty-two times annually, or five or six times on average. *See Hoefs v. Short,* 190 S.W. 802, 804 (Tex.Civ.App.—El Paso 1916), *aff'd,* 114 Tex. 501, 273 S.W. 785 (1925).

■ Although the facts of a particular case must be examined to determine if an area is a watercourse, the issue can be determined as a matter of law. *See Turner v. Big Lake Oil Co.,* 62 S.W.2d 491, 493 (Tex.Civ.App.—El Paso 1933), *aff'd,* 128 Tex. 155, 96 S.W.2d 221 (1936). The summary-judgment evidence submitted by the City included the following: an executive summary from the hearing before the Water Commission and the hearing examiner's PFD; the Water Commission's Order granting the City's application to amend its permit; several topographic maps from the U.S. Geological Survey prepared from aerial photographs taken in 1974 and 1985; an excerpt from Norman Domel's deposition; photographs taken by the Domels and by the Water Commission; two surveys of the Domels' property prepared in 1991 and 1998; and the affidavit of James Briggs, the City's Director of Community–Owned Utilities. We will now examine the three *Hoefs* elements as they apply to the facts in the summary-judgment record before us.

James Briggs testified as follows: he is responsible for the daily operations and long-term planning of the City's water and wastewater utility systems. The wastewater treated at the Dove Springs Plant City consists of groundwater and surface water that has been used by Georgetown-area residents. The City has operated the plant since 1993 without a single violation of the parameters set out in its discharge permit. Briggs personally inspected the tributary prior to 1990 and determined that it was a watercourse with well-defined bed and banks and was suitable as a receiving stream for discharge of treated wastewater. Under Briggs's direction, a study of the watercourse was conducted in 1997 for the renewal of the City's discharge permit; that study included cross-sectional measurements clearly showing the width and depth of the tributary and Mankins Branch at various points. These measurements, which were attached to Briggs' affidavit, show the tributary's width as being between eight and twenty-two feet measured 200 feet above County Road 102, between two and thirteen feet 50 feet below the road, and between one and eight feet 300 feet below the road.

The Geological Survey maps show the tributary flowing west past the site of the Dove Springs Plant to where it meets the Mankins Branch and then the San Gabriel River; a map legend corresponding to the Geological Survey maps labels the tributary as an intermittent stream or a narrow wash. Photographs from the files of the Water Commission taken in connection with the City's 1990 application to amend its discharge permit show the tributary both upstream and downstream from the discharge point. Some photographs depict a running stream, some show an apparently dry creek bed, but all the photographs evidence a channel with well-defined bank and beds. Aerial photographs taken in 1991 show the tributary where it enters the Domels' property; the tributary is clearly visible as a continuous stream or river bed with defined boundaries meandering through the surrounding farmland. Finally, the Water Commission classified the tributary as an intermittent stream; it also determined that the tributary has a defined bank and beds and has sufficient carrying capacity to contain the wastewater effluent.

In reviewing this summary judgment, we must view the evidence in appellants' favor and assume their proof to be true. However, the only summary-judgment evidence offered by appellants to contradict the above evidence is the affidavit of Ethel Domel. Mrs. Domel emphasizes that the condition of the drainage area since late 1993 is fundamentally different from the

condition of the area prior to the City's commencing the discharge of effluent. Her affidavit further states:

4. Prior to October 1993, the drainage area typically did not have a steady flow of water except in the weeks following significant rains. The area was frequently dry and portions of the area were used by my husband and the neighboring landowner to travel on the property. While it is true that throughout our ownership of the Domel Property the drainage area has served as a natural location for surface water to gather, I certainly would not characterize the area as a river, running stream, or watercourse. There are seeps in the area but, prior to October 1993, they alone were not sufficient to create a permanent source of water supply through the drainage area. Typically, it would take significant rains to create a flow of water passing through the drainage area for any significant amount of time. In the typical year, prior to October of 1993, absent significant rainfall, the area would be frequently dry during the late spring, summer and early fall. During the remainder of the typical year there might be intermittent water in the area, but the volume would vary greatly.

5. Prior to 1993, there was never a consistently flowing amount of water passing down the drainage way for enough time for the water to be a valuable source of irrigation water. In fact, prior to 1993, I do not recall a single time that we ever pumped water out of the drainage area for irrigation or otherwise. While we have pumped water out of the area on occasion since 1993, we have primarily relied upon other water sources for irrigation and watering our garden or trees.

6. I have read Mr. Briggs' June 11, 1998 affidavit where he describes the drainage area as a watercourse having "a defined channel with well defined bed and banks." Based on my familiarity with the property, these words certainly do not describe the creek before October 20, 1993. In several places, the drainage area has changed significantly over the time due to flooding and erosion. For example, the low place moved many feet near the flat area by the willow trees; the drainage moved over the course of time where there is now a bend going off and back on to our property from the neighbor's property, and there have been a number of changes in the drainage below the stock tank. Today, even with the relentless flow of the City's treated sewer water, I would not characterize the drainage area as having a "well defined bed and banks" or a "defined channel." This might be the case lower down on Mankins Creek as it approaches the San Gabriel, but on the Domel property, the area is more of a low place.

7. I believe the [Water] Commission's characterizations of the area as an intermittent stream with perennial pools is a fair description. I also agree with the City's pre-October 20, 1993 characterization of the creek as "intermittent" and "normally dry."

█ Affidavits supporting or opposing a motion for summary judgment must be made on personal knowledge and set forth facts that would be admissible in evidence. *See* Tex.R.Civ.P. 166a(f). To constitute competent summary-judgment evidence, an affidavit must set forth facts, not mere legal conclusions. *See Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984); *Hall v. Rutherford,* 911 S.W.2d 422, 424 (Tex. App.—San Antonio 1995, writ denied); *Beta Supply, Inc. v. G.E.A. Power Cooling Sys., Inc.,* 748 S.W.2d 541, 542 (Tex.App.—Houston [1st Dist.] 1988, writ denied).

The question presented is whether Mrs. Domel's affidavit raises an issue of material fact as to whether the tributary is a watercourse. We believe it does not.

Mrs. Domel admits that the tributary can fairly be classified as an intermittent stream with perennial pools. She also states that prior to 1993, there was a flow of water after significant rains, and that the tributary was dry from late spring until early fall. *Hoefs* instructs that a current of water "need not be continuous and the stream may be dry for long periods of time," and a stream may be "intermittent as to flow" and remain a watercourse. *Hoefs*, 273 S.W. at 786–87; *see also Humphreys–Mexia Co. v. Arseneaux*, 116 Tex. 603, 297 S.W. 225, 227–28 (1927) (holding Navasota River a watercourse even though plaintiff alleged it flowed only during rainy seasons from storm and flood waters); *Texas Co. v. Burkett*, 117 Tex. 16, 296 S.W. 273, 275–76 (1927) (finding Leon River a watercourse although it did not flow for six or eight months at a time). As described by Mrs. Domel, there was water in the tributary half of the year prior to 1993, and significant rainfall regularly produced a flow of water. Thus, the tributary has a current of water and a permanent source of supply; it therefore meets the second and third elements of the *Hoefs* test.

A closer question is presented by the first element of *Hoefs:* the presence of a defined bed and banks. Mrs. Domel denies that the tributary is a watercourse, referring to it instead as a "drainage area." However, her labels are not evidence, since an affidavit must set forth facts, not legal conclusions. *See Brownlee*, 665 S.W.2d at 112; *see also Manges v. Astra Bar, Inc.*, 596 S.W.2d 605, 612 (Tex. Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.) (non-movant's affidavit did not create fact issue on partial failure of consideration because affiant presented no facts showing either that he did not receive goods purchased or that they failed to meet contract specifications). Mrs. Domel's statement that she would not characterize the bed and banks as well-defined is similarly conclusory. The only stated facts describe how the course of the tributary has moved over time in some areas due to flooding and erosion. Mrs. Domel's factual statements prove too much: a tributary that has shifted its location has a defined course that changes from time to time. It is the nature of streams and rivers to shift course due to flooding and erosion; what distinguishes a watercourse from diffuse surface water is that it presently has a defined course, no matter that the course may shift over time. Temporal changes in the course of flowing water do not equate with having no bed and banks. The facts recited by Mrs. Domel are therefore insufficient to defeat summary judgment. Indeed, *Hoefs* holds that a watercourse may have a bed and banks that are entirely *absent* in some instances. *See* 273 S.W. at 787. We believe that the facts presented in paragraph six of Mrs. Domel's affidavit support rather than contradict the City's evidence establishing that the tributary had a defined bed and banks prior to 1993.

In *Turner v. Big Lake Oil Co.*, 62 S.W.2d 491, 493 (Tex.Civ.App.—El Paso 1933), *aff'd*, 128 Tex. 155, 96 S.W.2d 221 (1936), questions were submitted to the jury on whether the defendants were negligent in failing to adequately confine ponds of salt water near the source of Garrison draw, which crossed the plaintiffs' land. During a flood, salt water escaped from the ponds and flowed onto the plaintiffs' property, causing damage. One of the issues on appeal was whether Garrison draw was a watercourse; however, no jury question had been submitted on that issue. The court of appeals distinguished Chief Justice Cureton's opinion in *Hoefs* on the basis that the evidence was inadequate to show that Garrison draw was a watercourse as a matter of law:

In the case at bar, the evidence is silent as to whether Garrison draw has a channel with well-defined bed and banks. There is but little testimony

with reference to the flow of water therein. [The plaintiff] testified it took a good rain to make it run. It appears to be from one-fourth to one-half mile in width and several miles long. It evidently drains a considerable area.

Under the evidence it would seem that Garrison draw is just a wide valley; a typical West Texas draw. The evidence is insufficient to show that it has any of the essential characteristics of a water course in the legal sense of that term and falls within the rule announced by Judge Cureton applying to ravines, swales, etc., which are not generally considered as water courses.

*Id.* at 493.

The present case is distinguishable from *Turner.* Viewing the summary-judgment evidence in a light most favorable to the Domels, the tributary possessed a defined bed and banks prior to 1993, although their exact location has shifted over time. For many years, the tributary has been a stream with a defined channel; it is not a "wide valley" one quarter to half a mile wide. The tributary flows whenever there is significant rain. Moreover, nowhere in the summary-judgment evidence do appellants allege that the City's discharges have produced flooding, which would be the natural result if millions of gallons of water began flowing daily across open land or a mere "drainage ditch." The absence of any allegation of flooding supports what the Water Commission determined and the City's summary-judgment evidence shows: that the tributary had a defined bed and banks sufficient to serve as a receiving stream for the increased flow of water.

We hold that the summary-judgment evidence raises no genuine issue of material fact as to whether the tributary is a watercourse. Appellants' first issue is overruled.

## II. Constitutional Taking or Damage Claim

██ Appellants' second issue alleges that even if the tributary is a watercourse, the City's discharge of treated wastewater constitutes a taking or damaging of their property in violation of the Texas Constitution. Tex. Const. art. I, § 17 ("No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made...."). The elements of a takings case are (1) an intentional act of a government entity; (2) accomplished for a public purpose; (3) that damages or takes property from a private citizen. *See Steele v. City of Houston,* 603 S.W.2d 786, 788–92 (Tex.1980); *Bennett v. Tarrant County W.C.I.D. No. 1,* 894 S.W.2d 441 (Tex. App.—Fort Worth 1995, writ denied). The City argues that the Domels cannot satisfy the third element of this test because they have never possessed the property right at issue: the right to prevent the City from discharging treated wastewater into a watercourse of the State in compliance with a permit from a state agency.

We agree with the City that this appears to be a case of first impression; we have not found any Texas cases challenging the State's right to use a watercourse for a legitimate public purpose. The City argues that its right to discharge wastewater is found in the State's long history of protecting watercourses and water resources for the general public use and welfare. A brief examination of that history is helpful to our resolution of this issue.

### The Laws and Constitution of Texas Create the State's Right to Use Watercourses

In 1837, the Congress of the Republic of Texas expressly reserved ownership of the beds of all watercourses that were at least thirty feet wide, whether navigable or not, to the sovereign. *See* Act approved Dec. 14, 1837, 1st Cong., R.S., § 42, 1837 Repub. Tex. Laws 1404, *reprinted in* 1 H.P.N. Gammed, *The Laws of Texas 1822–1897,* at 1404, 1418 (Austin, Gammed Book Co. 1898). Half a century later, the legislature enacted the Irrigation Act of 1889,

which declared that "the unappropriated waters of every river or natural stream within the arid portions of the state" were "property of the public." Act approved Mar. 19, 1889, 21st Leg., R.S., ch. 88, § 2, 1889 Tex. Gen. Laws 1128, *reprinted in* 9 H.P.N. Gammed, *The Laws of Texas 1822–1897*, at 1128. In 1913, the legislature further expanded its domain over waters within the State:

> The unappropriated waters of the ordinary flow and underflow and tides of every flowing river or natural stream, of all lakes, bays or arms of the Gulf of Mexico, collections of still water, and of the storm, flood or rain waters of every river or natural stream, canyon, ravine, depression or watershed, within the State of Texas, are hereby declared to be the property of the State. . . .

Act of Apr. 9, 1913, 33d Leg., R.S., ch. 171, § 1, 1913 Tex. Gen. Laws 358, 358. This provision is codified almost verbatim in section 11.021(a) of the Water Code. *See* Tex. Water Code Ann. § 11.021(a) (West 1988).

In 1917, the Texas Constitution was amended to adopt article XVI, section 59, which states that

> The conservation and development of all of the natural resources of this State, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, power and all other useful purposes, . . . and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.

Tex. Const. art. XVI, § 59(a) (1917, amended 1964, 1973, 1978). Appellants' claim of a constitutional taking or damaging under article I, section 17 must be viewed in light of article XVI, section 59, which gives the State both the right and duty to conserve and develop its natural resources, including water. A natural tension results from the broad language of these different constitutional provisions, one generally preserving the rights of property owners and the other conferring general rights and duties on the State to conserve and develop water resources. We resolve this tension by looking to subsequent legislation that treats this balance of interests in more specific terms.

In 1967, the legislature passed the Water Rights Adjudication Act, which changed the traditional riparian rights to a State-licensed system, without compensation of riparian private property systems. *See* Act of Apr. 13, 1967, 60th Leg., R.S., ch. 45, 1967 Tex. Gen. Laws 86; Tex. Water Code Ann. §§ 11.301–.341 (West 1988 & Supp.1999). The Act requires all persons claiming water from any "stream or watercourse" to present their claims for adjudication by the Texas Water Development Board, now the T.N.R.C.C. *See* Tex. Water Code Ann. § 11.303(c)(3) (West 1988).

■■■■ Lands underlying navigable streams are owned by the State. *See State v. Bradford,* 121 Tex. 515, 50 S.W.2d 1065, 1069 (1932). Although the State did not retain ownership of lands underlying non-navigable water, it does not need title to use the bed and banks of a watercourse for their defined purpose of transporting water. As the City argues, the State has the right to transport water through watercourses for a public purpose without seeking permission from any riparian landowners. The bed and banks of a watercourse are burdened with the flow of water through that watercourse regardless of who holds actual title. Because the State owns water in a variety of watercourses, the State has the right to use the channel of the watercourse to meet its constitutionally mandated duty to conserve and develop the State's water resources. Otherwise, the State has title to a great volume of water throughout the State that it has no ability to control, store, preserve, or distribute without first obtaining easements or access rights from every riparian

landowner. Moreover, if the State does not have the right to use the channels of watercourses to transport water, any use of a non-navigable stream in Texas would constitute a taking where that water crosses private property. We believe that such is not and never has been the law in Texas.

The State's right to use its watercourses to transport water is implicit in several sections of a comprehensive statewide water plan passed by the legislature in 1997. *See* Act of June 1, 1997, 75th Leg., R.S., ch. 1010, 1997 Tex. Gen. Laws 3610 ("Senate Bill 1") (codified throughout the Texas Water Code). For example, a water supplier has the express right to use the bed and banks of any flowing stream in the State to convey water from its place of storage to the place of its intended use. *See* Water Code § 11.042(a) (West 1998 & Supp.1999). A groundwater user may discharge water and subsequently divert it for reuse from watercourses, subject to obtaining authorization from the State. *See id.* § 11.042(b). The State's ability to grant such authorization is contingent on its right to use its watercourses.

### Texas Case Law Has Never Questioned the State's Right to Use Watercourses

The present case is somewhat unique in that the Domels seek to *prevent* the State from causing water to flow along their property; there appears to be no case on point because water is such a highly valuable resource in Texas that most controversies involve parties who seek greater access to water. We have found no case presenting the question of whether a governmental entity must acquire permission to cause water to flow through a watercourse. We believe that the answer is self-evident, and that the dearth of case law indicates that the State's right to use a watercourse for transport is sufficiently

established to be unquestioned. In *City of Corpus Christi v. City of Pleasanton*, 154 Tex. 289, 276 S.W.2d 798 (1955), the supreme court considered whether Corpus Christi's act of transporting artesian well water via natural river channels and lakes to a settling basin 118 miles away constituted waste, since much of the water was lost. to evaporation, transpiration, and seepage. *See id.* at 799–800. Neither the court nor the parties questioned Corpus Christi's right to use natural stream channels to transport water more than 100 miles, presumably across some private land. While that case did not address the question before this Court, we believe it is in harmony with the City's theory that it need not seek a landowner's permission to transport clean water in a watercourse that traverses the landowner's property.

■ The State's usage rights do *not* include the right to flood lands owned by riparian landowners; such flooding may result in a constitutional taking or damaging of property. *See Brazos River Authority v. City of Graham*, 163 Tex. 167, 354 S.W.2d 99, 104–05 (1962) (finding constitutional taking and rejecting River Authority's argument that it "was legally entitled to flood the city's water disposal plant in carrying out its flood control and kindred activities"); *City of Odessa v. Bell*, 787 S.W.2d 525, 527–28 (Tex.App.—El Paso 1990, no writ) (upholding judgment for taking resulting from city's act of flooding plaintiff's land with sewer water). However, the Domels do not allege that the City has ever flooded their property with wastewater effluent, and the City does not claim any right to do so. For this reason, *Brazos River Auth.* and *Bell* are distinguishable from the present case, and appellants' reliance on these authorities is misplaced.[5] Nor does the City argue that

---

5. Appellants also cite *Mathis v. City of DeRidder*, 599 So.2d 378 (La.Ct.App.1992), for the proposition that a city must obtain drainage servitudes from downstream landowners to discharge treated wastewater into a creek adjoining their lands. Although we are not bound by the holdings of Louisiana courts, we find *Mathis* distinguishable from the present cause because DeRidder conceded that it had failed to obtain drainage easements from contiguous landowners as required under Louisiana law. *See Mathis*, 599 So.2d at 381–82

it has the right to use watercourses to transport untreated wastewater. *See Abbott v. City of Kaufman,* 717 S.W.2d 927, 929 (Tex.App.—Tyler 1986, writ dism'd) (reversing summary judgment granted against plaintiffs who alleged their land was flooded with "sewage and filthy water").

### The State's Usage Right is the Same Whether the Flow of Water is "Natural" or "Man–Made"

The Domels note that the Water Code codifies the traditional civil law rule recognizing natural easements for surface waters that flow naturally from the dominant estate onto the servient estate. *See* Water Code § 11.086; *Kraft v. Langford,* 565 S.W.2d 223, 229 (Tex.1978) (discussing predecessor to § 11.086). Appellants argue that such easements are limited to the quantity of water naturally flowing in the area; there is no servitude if the flow is created by a human act. In support of their argument, they cite *Miller v. Letzerich,* 121 Tex. 248, 49 S.W.2d 404, 408 (1932) and *Jefferson County Drainage Dist. No. 6 v. Lower Neches Valley Authority,* 876 S.W.2d 940, 950 (Tex.App.—Beaumont 1994, writ denied). However, section 11.086 and the above cases all concern the diversion of surface water *before* it enters a watercourse, which has nothing to do with the body of law governing water in a watercourse. Appellants have cited no statutes or cases indicating that Texas law recognizes any distinction between natural and "man-made" flows of water in a watercourse.

Indeed, Texas law recognizes treated wastewater as a valuable resource, just as naturally flowing waters are. Senate Bill 1 expanded the Water Code section on the delivery of water using the bed and banks of a watercourse to include treated wastewater return flows derived from privately owned groundwater. *See* Water Code § 11.042(b) (West Supp.1999). In the chapter of the Administrative Code pertaining to substantive water rights, the T.N.R.C.C.'s definition of "baseline or normal flow," notes that "[a]ccountable effluent discharges from municipal, industrial, irrigation or other uses of ground or surface waters may be included at times." 30 Tex.Admin. Code § 297.1 (West 1998). Similarly, the definition of "return water or return flow" describing state water returned to a watercourse includes wastewater effluent; return water must be returned to a water supply or watercourse at a point stated by permit, and must conform to quality standards set by the State. *Id.* §§ 297.1, .45(b); *see also* Water Code § 11.046(a) (West Supp.1999) (water taken or diverted from watercourse or stream must be returned to same if reasonably practicable and can be accomplished by gravity flow). Once return flows are given back to a watercourse, they become part of the normal flow. *See id.* § 11.046(c). The statutory scheme governing treated wastewater defeats the Domels' contention that "man-made" effluent contained in a watercourse should be treated differently from the natural flow.[6]

### The Statutory and Permit Language Cited by Appellants Does Not Create Rights for Landowners

Finally, the Domels rely on language from the Water Code and permit language derived from the Administrative Code as requiring the City to obtain permission from downstream landowners to discharge treated wastewater. Section 7.004 of the Water Code provides:

> Nothing in this chapter affects the right of a private corporation or individual to pursue any available common law remedy to abate a condition of pollution or other nuisance, to recover damages to enforce a right, or to prevent or seek

(citing La.Rev.Stat. Ann. §§ 19:101, 33:4162. (West 1999)). Texas has no comparable statutory requirement.

**6.** Indeed, Mrs. Domel acknowledges in her affidavit that appellants have used the treated wastewater for irrigation purposes since 1993.

redress or compensation for the violation of a right or otherwise redress an injury.

Water Code § 7.004 (West Supp.1999). The Administrative Code states: "A permit issued within the scope of this subchapter does not convey any property rights of any sort, nor any exclusive privilege, and does not become a vested right in the permittee." 30 Tex. Admin. Code § 305.122(b) (1998). Pursuant to this section, the City's discharge permit granted by the Water Commission states: "The issuance of this permit does not grant to the permittee the right to use private or public property for conveyance of wastewater along the herein described discharge route.... It is the responsibility of the permittee to acquire property rights as may be necessary to use the herein described discharge route." We find that none of the above language from the Water Code, the Administrative Code, or the City's permit supports the Domels' position. The permit language derived from the Administrative Code simply clarifies that granting a permit confers no property rights to the permittee. Since the City already has the right to use watercourses for lawful public purposes, it needs no additional authority to do so in the present circumstances where it is not violating any property right possessed by the Domels or other landowners. Similarly, section 7.004 of the Water Code merely clarifies that the Code does not take away from landowners their common-law remedies to enforce rights; it does not grant them additional rights, such as the right to prevent the City from discharging treated effluent that conforms to the State's water quality standards. In this case, where no flooding is occurring and the odorless effluent creates no nuisance, section 7.004 does not advance the Domels' argument.

Amici, the Texas Municipal League, Texas City Attorneys Association, and Texas Municipal Utility Association, point out additional reasons why the Domels'

position is untenable. Amici state that there are currently approximately 1,200 incorporated cities in Texas operating wastewater treatment plants under permit of the State. Amici claim that approximately 500 of these plants discharge wastewater effluent into small watercourses, and that none of the operating cities have acquired easements or other consent from downstream property owners. Amici point out the tremendous public expense that will likely result if cities are required to pay downstream landowners to discharge water that has been certified as meeting cleanliness standards set by the State.

While these projected costs are irrelevant to the question of whether the City has the usage right at issue, we agree with amici that the present case involves the classic NIMBY[7] problem: the City is responsible for providing clean and safe water to its residents for domestic use. Part of that process includes recycling used water by cleaning it and returning it to a watercourse or water source pursuant to state law. Yet no matter how clean the wastewater effluent is, it will retain a stigma of being, as appellants describe it, "treated sewer water." We do not believe that the law recognizes a cause of action based on this stigma. The legislative scheme contemplated in the Water Code, informed by this state's judicial history of water law, precludes the Domels' claim of a constitutional taking. Appellants' second issue is overruled.

## CONCLUSION

The summary-judgment evidence establishes that the tributary is a watercourse belonging to the State. In using the tributary to discharge treated wastewater, the City has never flooded the Domels' property or violated the parameters of the discharge permit granted by the Water Commission. Under these conditions, we hold that the City does not need additional per-

7. An acronym for the phrase "Not In My    Back Yard."

mission from the Domels or other downstream landowners. The summary judgment in favor of the City is affirmed.

ABOUSSIE, Justice, dissenting.

The majority holds that the City of Georgetown established that the intermittent stream flowing through the Domel's property meets the criteria of a watercourse as a matter of law. Consequently, the City's lawful discharge of effluent from the upstream wastewater treatment plant did not constitute a taking or damage the Domel's property. Accepting as true evidence in favor of the Domels, indulging every reasonable inference, and resolving all doubts in their favor, I conclude that Mrs. Domel's affidavit raises a material issue of fact about whether the intermittent stream meets the criteria for a watercourse under Texas law. Respectfully, I dissent.

Surface water is categorized into two general types: diffuse surface water and water that is within a watercourse. Diffuse surface water belongs to the owner of the property on which it gathers, so long as it remains on that land before it passes into a natural watercourse. *See Turner v. Big Lake Oil Co.*, 128 Tex. 155, 96 S.W.2d 221, 228 (1936). Water in a watercourse is the property of the State, held in trust for the public. *See* Tex. Water Code Ann. § 11.021(a) (West 1988). A watercourse has (1) a defined bank and beds, (2) a current of water, and (3) a permanent source of supply. *See Hoefs v. Short*, 114 Tex. 501, 273 S.W. 785, 787 (1925). As the majority recognizes, the bed and banks of a watercourse may be "slight, imperceptible, or absent" in some instances without losing its character as a watercourse. *Id.* Additionally, the current of water "need not be continuous and the stream may be dry for long periods of time." *Id.* Finally, regarding the third element, the *Hoefs* court stated that "the stream must be such that similar conditions will produce a flow of water, and that these conditions recur with some regularity, so that they estab-

lish and maintain a running stream for considerable periods of time." *Id.* at 788.

Mrs. Domel stated that she and her husband have owned the property since 1948 and she was familiar with the appearance of the property and the area at issue. She characterized the disputed property as a "low place" or a "drainage area." Before the City started pumping effluent in October 1993, the seeps in the area were not enough to create a permanent source of water supply. Also before October 1993, the only time there was a steady flow of water through the area would be after significant rains. In a typical year before October 1993, the area was frequently dry during the late spring, summer, and early fall. During the remainder of the year, there might be water in the area, but the volume would vary greatly. Although the City's utility director inspected the area before 1990 and concluded that it was a watercourse with well-defined bed and banks, Mrs. Domel disputed this description. She stated that before October 1993, the area did not have a defined channel with well-defined bed and banks. Even with the relentless flow of the City's effluent, the area does not have a well-defined bed, banks, or channel.

Accepting as true Mrs. Domel's affidavit, indulging every reasonable inference, and resolving all doubts in favor of the Domels, I would hold that her affidavit raises an issue of material fact about whether the area at issue is a watercourse. Although I agree that the issue of whether an area is a watercourse may be decided as a matter of law, based on the evidence submitted in this case, I do not agree that the City has established the existence of all three *Hoefs* elements as a matter of law. I would reverse the summary judgment and remand the cause to the district court for further proceedings.