Affirmed and Majority and Dissenting Opinions filed July 24, 2003









Affirmed and Majority and Dissenting Opinions filed
July 24, 2003.

 

 

 

 

 

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO.
14-01-01168-CV

____________

 

KEVIN DIETRICH, DENISE DIETRICH, and SETH DIETRICH, a minor
child, Appellants

 

V.

 

HAROLD C. GOODMAN, JR. and WINFORD J. GOODMAN,
Appellees

 



 

On
Appeal from the 165th District Court

Harris County, Texas

Trial
Court Cause No. 99-41790

 



 

M
A J O R I T Y   O P I N I O N

Kevin Dietrich, Denise Dietrich, and Seth Dietrich, a minor
child, (ADietrichs@) appeal from the trial court=s (1) directed verdict in favor of
Harold C. Goodman Jr. and Winford J. Goodman, (AGoodmans@); and (2) denial of their motion for
new trial.  We affirm.








Memorial
Northwest, a suburban subdivision in northwest Harris County, was developed
during the mid-1990s.  Part of the
development included a country club recreational area containing wooded
acreage, tennis courts, and other amenities. 
Because the recreational area was located on property having a higher
elevation than some of the residential lots, a storm sewer was constructed at
the rear of one of the residential lots where it was intended to intercept
surface water flowing from the recreational area toward the lower residential area
during times of heavy rainfall.

When
viewed from above, the storm sewer had a flat concrete top, approximately four
feet square, with an iron manhole cover in the center.  The drain, which was not visible from above,
was located vertically on one side of the concrete structure.  The drain opening faced the country club and
extended to a depth of approximately two feet. 
The storm sewer was located on the right, rear corner of a residential
lot and strategically placed at the base of a natural gully which drained
approximately four acres of wooded recreational property when it rained.  So long as the drain opening was free of
debris, it was capable of capturing and diverting over 1,000 gallons of water
per minute.

In
December of 1997, the Goodmans moved into the home constructed on the lot
containing the storm sewer.  The Goodmans
testified the house was under construction, and about ninety percent complete
when they first saw it.  Not
surprisingly, the back yard contained mounds of dirt and construction debris.  They noticed a concrete pad in their yard
located about 12 to 18 inches from a privacy fence marking the rear boundary of
their property.  Although Mr. Goodman
recognized the man hole cover as a means of access into a storm sewer, he
testified he had no idea the drain opening was on his property.  Since all four sides of the structure were
covered with dirt, Goodman assumed the drain was located behind his fence on
the recreational property.








Mr. Goodman=s
testimony was disputed by George Goettee, the developer/builder.  Goettee claimed that when he walked the
property with Goodman, the drain was uncovered and clearly visible.  In fact, Goettee claims he stepped down into
the two foot deep channel leading to the drain while in Goodman=s
presence, and told him he would need to keep the drain clear.  Goodman, on the other hand, testified that
(1) there was no channel leading into the storm sewer because it had been
filled with dirt; (2) the drain was not visible; (3) the drain was so close to
the rear fence, Goettee could not have stepped down into the channel even if it
had been clear of dirt and debris; and (4) Goettee offered to landscape the
yard in such a way as to hide or cover the top of the storm sewer.

Thereafter,
Goodman noticed standing water both in and behind his backyard.  Assuming the drain was clogged, and further
assuming the drain was located on the recreational property, Goodman called the
country club and requested that the drain be cleared.  When the problem was not rectified, Goodman
claims he called the country club on at least four other occasions.

In August of
1998, the Dietrichs purchased a house adjacent to the Goodmans=
home.  Two months later, during a
torrential thunderstorm, the Dietrichs awakened to find several inches of water
on the first floor of their home.  Mr.
Dietrich, fearing that his neighbor might also be in danger of flooding,
awakened the Goodmans in the early morning hours to alert them to the
danger.  The Goodman family immediately
began digging two ditches to drain water out of their backyard and divert it
along both sides of their house.  The
Dietrichs and the Goodmans also opened fence gates to facilitate the flow of
water to the street in front of their respective homes.

The Dietrich
home was heavily damaged by the flood water. 
In a subsequent investigation into the cause of the flooding, an
engineer located the drain and discovered that it was occluded by dirt, roots,
and several bricks.  The engineer, later
assisted by the Goodmans, cleared the drain. 
Eventually, the storm sewer was relocated and moved onto country club
property.








Asserting
claims of  negligence, violations of the
Texas Water Code ' 11.086, and trespass, the Dietrichs filed suit against the
Goodmans.  The Dietrichs also sought
exemplary damages alleging malice.  The
trial court granted the Goodmans= directed verdict on all claims other than simple
negligence.  A jury subsequently found
the Goodmans were not negligent. 
Thereafter, the Dietrichs filed a motion for new trial based on their
claims of statutory liability and malice. 
The motion was denied, and the Dietrichs have pursued this appeal. 

Standard
of Review

In
reviewing the trial court=s granting of a directed verdict, we must determine whether
there is any evidence of probative force to raise a fact issue on the material
questions presented.  Szczepanik v.
First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994).  We consider all of the evidence in the light
most favorable to the party against whom the verdict was instructed and
disregard all contrary evidence and inferences; we give the losing party the
benefit of all reasonable inferences created by the evidence.  Id. 
If there is any conflicting evidence of probative value, a directed
verdict is improper and the case must be reversed and remanded for jury
determination of that issue.  Id.  

Surface
Water

Section
11.086(a) of the Texas Water Code prohibits a person from diverting or
impounding the natural flow of Asurface water@ in a manner that damages the property of another by the
overflow of the water diverted or impounded. 
Tex. Water Code Ann. '
11.086(a) (Vernon 2000).  Damages are
allowed under the statute when A(1) a diversion or impoundment of surface water (2)
causes (3) damage to the property of the plaintiff landowner.@  See Bily v. Omni Equities, Inc., 731 S.W.2d
606, 611 (Tex. App.CHouston [14th Dist.] 1987, writ ref=d n.r.e.) (emphasis added); see also Kraft v. Langford,
565 S.W.2d 223, 229 (Tex. 1978) (addressing an earlier version of the
statute).








Although
Kevin Dietrich testified he had no reason to believe the Goodmans knew of the
drain on their property until after the flood, the Dietrichs nevertheless
contend they were damaged by the Goodmans= actions in landscaping around and over the storm sewer.  Specifically, the Dietrichs contend they were
flooded when the Goodmans diverted Asurface water@ onto their property in violation of the Water Code.  Thus, the Dietrichs allege the trial court
erred in granting the Goodmans= motion for a directed verdict on the issue of statutory
liability under Texas Water Code ' 11.086(a).  The
Goodmans, however, argue that the Dietrichs= Water Code claim fails, as a matter of law, because the water
that flooded the Dietrichs= home was not Asurface water.@

ASurface water@ is not defined by the Water Code.  Compounding this legislative oversight is the
fact that the term has been used in different contexts.  In common usage, the term simply means Anatural
water that has not penetrated much below the surface of the ground.@  Webster=s Third New International Dictionary 2300 (1993).

However,
when used in connection with riparian rights, Asurface water@ is a term of art.  Under
common law, diffused surface water, as well as percolating ground water,
belongs to the land owner.  See
Dyegard Land Partnership v. Hoover, 39 S.W.3d 300, 311 (Tex. App.CFort
Worth 2001, no pet.) (holding owner of land is absolute owner of percolating
water because it is part of the soil);  Domel
v. City of Galveston, 6 S.W.3d 349, 353 (Tex. App.CAustin
1999, pet. denied) (holding diffused surface water belongs to the owner of the
land on which it gathers, so long as it remains on that land and prior to its
passage into a natural watercourse). 
However, water in a watercourse, such as a stream or river, is the
property of the state, held in trust for the public.  Tex.
Water Code Ann. ' 11.021 (Vernon 2000);  South
Tex. Water Co. v. Bieri, 247 S.W.2d 268, 272 (Tex. Civ. App.CGalveston
1952, writ ref=d n.r.e.) (holding it is a well-established rule in Texas that
waters of public streams belong to the sovereign and are held by the sovereign
in trust for the public).








Used
in this context, Asurface water@ is simply a shortened form of the phrase Adiffused
surface water.@  Black=s Law Dictionary 1585 (7th ed. 1999).  Thus, Asurface water@ is simply water or natural precipitation diffused over the
surface of the ground until it either evaporates, is absorbed by the land, or
reaches a bed or channel in which it is accustomed to flow.  Raburn v. KJI Bluechip Investments, 50
S.W.3d 699, 704 (Tex. App.CFort Worth 2001, no pet.). 
Consequently, a distinguishing feature of Asurface water@ is that it is never found in a natural watercourse.  A Awatercourse@ has been judicially defined as having (1) a bank and bed, (2)
a current of water, and (3) a permanent source of supply.  Hoefs v. Short, 273 S.W. 785, 787
(1925).  Although the source must be
permanent, such as a watershed, it need not be continuous, and a watercourse
may be dry for long periods of time.  Id.

Interpreting
former enactments of the present statute, the courts of this state, early on,
were not particularly concerned with the character of the water being
diverted.  In other words, it did not
seem to matter much whether the water at issue was diffused surface water,
impounded water, or water in a watercourse (whether natural or man-made); if
water was unreasonably concentrated or diverted onto the plaintiff=s
land in manner causing him injury, the defendant was liable for the
damage.  See Miller v. Letzerich,
292 S.W. 560 (Tex. Civ. App.CAustin 1927), aff=d, 49 S.W.2d 404
(Tex. 1932) (holding defendant unlawfully diverted overflow of surface water
from lake onto the plaintiff=s property); St. Louis S.W. Ry. Co. of Tex. v. Wilson,
273 S.W. 622, 623 (Tex. Civ. App.CBeaumont 1925, no writ) (holding railway was liable when its
embankment had the effect of concentrating diffused surface water onto
plaintiff=s property); Higgins v. Spear, 283 S.W. 584, 587B88
(Tex. Civ. App.CEl Paso 1926), aff=d, 15 S.W.2d
1010 (Tex. 1929) (holding defendant was liable for damages when he obstructed a
dry river bed that had the effect of diverting water upon his neighbor=s
land when it rained); Rattan v. Woods, 267 S.W. 312 (Tex. Civ. App.CTexarkana
1924, no writ) (holding defendant was liable for damages stemming from the
damming of a ditch);  Hammond v.
Knight, 262 S.W. 183, 183B84 (Tex. Civ. App.CTexarkana 1924, no writ) (holding defendant could not lawfully
divert water flowing in a natural ravine).








Beginning
approximately seventy years ago, however, the courts of this state started
inserting the riparian (as opposed to the common) definition of surface water
into their construction of the statute. 
Thus, today the term Asurface water,@ as used in Section 11.086 of the Water Code, means only Adiffused
surface water.@  Accordingly, the
statute has been effectively neutered by many years of judicial
construction.  Consider, for example,
that where water is concentrated by man-made canals to the detriment of the
plaintiff, it has been held that no cause of action lies under the statute.[1]  Likewise, where the defendant emptied
numerous storm sewers into a creek, allegedly causing it to swell and erode the
plaintiff=s property, the plaintiff could not prevail under the statute.[2]  Similarly, where the defendant altered the
flow of water by widening, deepening, and straightening a natural creek, the
plaintiff could not complain of the diversion of water upon his land because
such water was not Asurface water.@[3]








Although
it is still possible for a plaintiff to find relief under the statute where the
flow of a broad expanse of diffused surface water is diverted by a berm,[4]
he has no cause of action stemming from the diversion of water contained in a
natural watercourse.[5]  Thus, a landowner might divert the entire
Brazos River across his neighbor=s property without subjecting himself to liability under
Section 11.086 of the Water Code.  This
anomaly seems to have arisen, long ago, when courts erroneously took the
definition of Asurface water@ commonly used in deciding issues of riparian rights and
inserted it into a statute having nothing to do with riparian rights.[6]  Were we writing on a clean slate, we would
likely find the legislature did not intend such a restrictive application of
the statute as is now universally accepted by the courts of this state.  However, the legislature has had more than
half a century to rectify the effect of mounting jurisprudence and amend the
statute by defining Asurface water.@  The legislature,
however, has not done so.  Whether this
inaction is due to oversight or legislative approval of the existing
jurisprudence, we cannot tell.  Although
we are not formally bound to follow the decisions of other intermediate courts,
we are reluctant to depart from a so long and well-established line of cases,
particularly where the legislature has, by its silence, seemingly approved the
jurisprudence on this subject.

Accordingly,
unless or until the legislature amends the statute, we reluctantly hold that
the term Asurface water,@ as used in Section 11.086 of the Water Code, means diffused
surface water, i.e., water Awhich is diffused over the ground from falling rains or melting
snows, and [it] continues to be such until it reaches some bed or channel in
which water is accustomed to flow.@  City of Keller v.
Wilson, 86 S.W.3d 693, 711 (Tex. App.CFort Worth 2002, pet. filed); Stoner, 392 S.W.2d
at 912.  In other words, the chief
characteristic of Asurface water@ is that it does not follow a defined course or channel and
does not gather into or form a natural body of water.  Dalon, 852 S.W.2d
at 538; 78 Am.Jur. 2D Waters
'
174, at 509B10 (2002).  Where rain
water is under control by a ditch, tank, pond, or pipe, it no longer qualifies
as surface water.  Id.








Here,
the water diverted onto the Dietrichs= property on account of the occluded drain was runoff from the
country club property behind the Dietrichs= and Goodmans= homes.  The water was
concentrated and directed toward the drain by a shallow, but readily visible,
natural gully, that extended sixty feet or more up into the wooded area of the
country club property.

When
rain water fell directly on the tennis courts and wooded acreage on the night
of the flood at issue, it undeniably possessed the character of surface
water.  When the water entered the
channel leading to the storm sewer, however, its character changed.  The water flowed in a well-defined bed, which
led toward the drain inlet.  As the
rainwater flowed down the channel to the drainage inlet in the Goodmans=
backyard,[7]
it was blocked by roots, mulch, and dirt. 
Thus, the water flowed across the corner of the Goodman=s
backyard onto the Dietrichs= property which had a lower elevation.  Until it reached the blocked drain, the water
was under the control and direction of a watercourse,[8]
and thus, it no longer qualified as surface water.  City of Keller, 86 S.W.3d
at 711; Mitchell, 730 S.W.2d at 795.  As such, there was no diversion of surface
water when the rain water was redirected from the drain inlet.  Dalon, 852 S.W.2d
at 538.  Accordingly, the Dietrichs=
first issue is overruled.

Malice 








In
their second issue, the Dietrichs allege the Goodmans acted with malice because
Mr. Goodman admitted his backyard had standing water on several occasions
before the flood at issue, and he failed to remedy the problem.  Malice is defined as, A(A)
specific intent by the defendant to cause substantial injury to the claimant;
or (B) an act or omission: (i) which when viewed objectively from the
standpoint of the actor at the time of its occurrence involves an extreme
degree of risk, considering the probability and magnitude of the potential harm
to others; and (ii) of which the actor has actual, subjective awareness of the
risk involved, but nevertheless proceeds with conscious indifference to the
rights, safety, or welfare of others.  Tex. Civ. Prac. & Rem. Code Ann. '
41.001(7) (Vernon 1997); Transp. Ins. Co. v. Moriel, 879 S.W.2d
10, 23 (Tex. 1994).  The definition of
malice consists of two prongs: part one defines an objective prong, and part
two describes the subjective prong.  Tex. Civ. Prac. & Rem. Code Ann. '
41.001(7).  Objectively, the defendant=s
conduct must involve an extreme risk of harm. Wal-Mart Stores, Inc. v.
Alexander, 868 S.W.2d 322, 325B26 (Tex. 1993) (discussing common law gross negligence, which,
like malice, consists of two prongs). 
Subjectively, the defendant must have awareness of the extreme risk
created by the conduct.  Moriel,
879 S.W.2d at 22.   

In
order to obtain exemplary damages, malice must be proved by clear and
convincing evidence.  Tex. Civ. Prac. & Rem. Code Ann. '
41.003(a)(1) (Vernon 1997).  Clear and
convincing evidence means the measure or degree of proof that will produce in
the mind of the trier of fact a firm belief or conviction as to the truth of
the allegations sought to be established. 
Tex. Civ. Prac. & Rem. Code
Ann. ' 41.001(2) (Vernon 1997). 









Here,
the Dietrichs failed to present any evidence showing the Goodmans acted with
malice.  Kevin Dietrich admitted that he
did not believe the Goodmans knew the drain inlet was on their property.  His opinion is bolstered by the fact that
when the Goodmans= home was threatened by the same deluge that flooded the
Dietrichs= home, the Goodmans did not clear the drain, but rather, they
opened gates and dug ditches to try to prevent their home from being
inundated.  The evidence also shows that
prior to the flood, Mr. Goodman observed standing water on his property, and
that he requested on several occasions that the drain inlet be cleared
(assuming, of course, that the inlet was located on the recreational property
behind his lot).  While the evidence
showed, and the Goodmans admitted, that they landscaped over the top of the
storm sewer, i.e., the manhole cover and surrounding concrete pad, this
act was not malicious because there was no drain inlet on the top of the
structure.  Moreover, even if Mr. Goodman
had filled the side inlet with dirt and debris, as Mr. Goettee opined, there
was no evidence showing Goodman was aware of an extreme degree of risk or the
magnitude of the potential harm to the Dietrichs.

Accordingly,
the Dietrichs= second issue is overruled.

Jury Misconduct

In their third issue, the Dietrichs allege they were entitled
to a new trial due to jury misconduct. 
The Dietrichs contend the foreman refused another juror=s
requests to (1) inquire of the trial judge about the amounts for personal
property and the contents of the home, and (2) ask the trial judge if the jury
could deliberate for an extra hour before being discharged for the
weekend.  The Dietrichs also claim that
one of the jurors stated during deliberations that he worked in the
construction industry, and the Dietrichs were seeking more money than needed to
repair their home.  

Rule 327
provides in pertinent part, as follows:

. . . when the
ground of a motion for new trial, supported by affidavit, is misconduct of the
jury . . . the court shall hear evidence thereof from the jury or others in
open court, and may grant a new trial if such misconduct proved, . . . be
material, and if it reasonably appears from the evidence from the hearing of
the motion and the trial of the case and from the record as a whole that injury
probably resulted to the complaining party.

Tex. R. Civ. P. 327(a); Strauss
v. Cont=l Airlines, Inc.,
67 S.W.3d 428, 446 (Tex. App.CHouston [14th Dist.]
2002, no pet.).  








To
warrant a new trial for jury misconduct, the Dietrichs had the burden of
proving that (1) the misconduct occurred; (2) it was material; and (3) it
probably caused injury.  Tex. R. Civ. P.  327(a); Golden Eagle Archery, Inc. v.
Jackson, 24 S.W.3d 362, 327 (Tex. 2000). 
Whether misconduct occurred is a question of fact for the trial court,
and if there is conflicting evidence on this issue, the trial court=s
finding must be upheld on appeal.  Pharo
v. Chambers County, Tex., 922 S.W.2d 945, 948 (Tex.
1996).  Misconduct justifies a new trial
only if it reasonably appears from the record that injury probably resulted to
the complaining party.  Id. at
950.  Determining the existence of
probable injury is a question of law.  Strauss,
67 S.W.3d at 447.

The
Dietrichs alleged the foreman refused to ask the judge a question regarding the
inclusion of damages for personal property and refused to ask the judge to
deliberate for an additional hour, which substantially affected the jury=s
answer to question number three.[9]  Although the Dietrichs allege harm, the jury
found in their answers to questions one and two that no negligence of the
Goodmans proximately caused the occurrence in question and that the injury
sustained by the Dietrichs was due solely to the negligence of Goettee
Construction Company, the developer of the property.  Thus, the jury=s answer to question number three is immaterial with regard to
the Goodmans= liability.  Under the
circumstances presented here, the Dietrichs cannot show the alleged misconduct
had any prejudicial effect.  Tex. R. Civ. P. 327(a); Golden Eagle
Archery, 24 S.W.3d at 327. 








Moreover,
with regard to one of the jurors giving his opinion as to the cost of repairs,
such conduct does not constitute an Aoutside influence.@  Jury misconduct occurs
where the jury was influenced by outside sources.  Golden Eagle Archery, 24 S.W.3d
at 370.  Outside influence must emanate
outside the jury deliberations, and thus, information introduced by a juror to
the rest of the panel fails to constitute outside influence.  See id.  Accordingly, the Dietrichs=
third issue is overruled.  

The
judgment of the trial court is affirmed. 

 

 

 

 

 

/s/        J.
Harvey Hudson

Justice

 

 

 

 

 

 

 

 

Judgment rendered and Majority and
Dissenting Opinions filed July 24, 2003.

Panel consists of Chief Justice Brister,
Justice Hudson, and Senior Chief Justice Murphy.*(Brister,
C.J. dissenting).

 











[1]  See
Jefferson Cty. Drainage Dist. No. 6 v. Lower Neches Valley Auth., 876
S.W.2d 940, 950 (Tex. App.CBeaumont 1994, writ denied) (holding surface waters do
not remain surface waters once they enter into a channel that has been touched
or modified by the hands of man). 





[2]  See Dalon
v. City of DeSoto, 852 S.W.2d 530, 538B39 (Tex.
App.CDallas 1992, writ denied) (holding when rainfall is
under control, either by ditches, tanks, ponds, or pipes, it is no longer
surface water). 





[3]  See Stoner
v. City of Dallas, 392 S.W.2d 910, 911B12 (Tex.
App.CDallas 1965, writ ref=d
n.r.e).





[4]  See Boatman
v. Lites, 970 S.W.2d 41, 44B45 (Tex. Civ. App.CTyler
1998, no pet.) (holding that water in a culvert diverted by the defendant=s berm was not Asurface
water,@ but diffused surface water that flowed across an
expanse of roadway during times of heavy rainfall and was diverted by the
defendant=s berm was actionable under the statute).





[5]  Dalon,
852 S.W.2d at 538.





[6]  As Justice
Frankfurter once observed, AA phrase begins life as a literary expression; its
felicity leads to its lazy repetition; and repetition soon establishes it as a
legal formula, undiscriminatingly used to express different and sometimes
contradictory ideas.@  Tiller v.
Atlantic Coast Line R. Co., 318 U.S. 54, 68 (1943) (Frankfurter, J.,
dissenting).





[7]  An easement
existed on the Goodmans= property which allowed any natural watercourse to run
across it.  





[8]  Although one
could argue rain falling directly on top of the drainage inlet was surface
water because it was not directed in a channel or ever touched by the hands of
man, it could amount to only a minute fraction of the flood water that entered
the Dietrichs= home.  





[9]  Question
number three reads:

What is the difference in the market value in Harris County, Texas, of
the residence owned by KEVIN DIETRICH, DENISE DIETRICH, both individually A/N/F
of SETH DIETRICH, immediately before and immediately after the occurrence in
question?

AMarket
value@ means the amount that would be paid by a willing
buyer who desires to buy, but is not required to buy, to a willing seller who
desires to sell, but is under no necessity of selling.

Do not include any amount for any condition resulting from the failure,
if any, of the Dietrichs to have acted as persons of ordinary prudence would
have done under the same or similar circumstances in caring for and treating
the property repairs, if any, that resulted from the occurrence in
question.  Do not include interest on any
amount you find.

Answer in dollars and cents for damages, if any.

Answer:  $115000.00





*  Senior Chief
Justice Paul C. Murphy sitting by assignment.