**Affirmed; Opinion Filed August 28, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01456-CV

### SLOAN CREEK II, L.L.C., Appellant
### V.
### NORTH TEXAS TOLLWAY AUTHORITY and THE STATE OF TEXAS, Appellees

**On Appeal from the County Court at Law No. 6
Collin County, Texas
Trial Court Cause No. 006-3356-2008**

## OPINION

Before Justices Fillmore, Myers, and Evans
Opinion by Justice Evans

This is an interlocutory appeal of the trial court's orders granting two pleas to the jurisdiction challenging an inverse condemnation counterclaim under article I, section 17 of the Texas Constitution. In its counterclaim, Sloan Creek II, L.L.C. alleged the increased amount and rate of erosion of creek banks on its property due to increased rainwater runoff from highway improvements was an inverse condemnation in violation of the Texas Constitution. Because we conclude Sloan Creek II failed to create a fact issue on whether the governmental entities involved knew the highway improvements were substantially certain to increase the amount and rate of erosion, we affirm the trial court's orders dismissing the article I, section 17 counterclaim.

### I. BACKGROUND

Sloan Creek lies south of the center of the interchange of SH 121 and US 75 on the east side of US 75. The creek generally runs towards the southeast then more easterly across the

southern edge of approximately 219 acres owned by Sloan Creek II. Before 2008, the surrounding watershed drained rainwater into Sloan Creek, including drainage from the interchange of SH 121 and U.S. 75.[1] Expanding SH 121, changing it into a tollway, and constructing a new interchange of SH 121 and US 75 was part of section 4 of the Sam Rayburn Tollway project of the Texas Department of Transportation. TxDOT awarded to the North Texas Tollway Authority the Tollway project. The project was designed by, and the construction overseen by, engineering firms under contract with NTTA. The Tollway improvement design included additional acres of roadway surface and a drainage system that were designed to discharge rainwater runoff into Sloan Creek.

Sloan Creek II was already in condemnation proceedings with NTTA regarding an easement NTTA sought for the Tollway drainage system, when Sloan Creek II filed a counterclaim against NTTA and TxDOT[2] for inverse condemnation under article I, section 17 of the Texas Constitution. The counterclaim sought compensation for damage resulting from the Tollway improvement of the SH 121 interchange with US 75. NTTA and TxDOT filed pleas to the jurisdiction addressing the counterclaim under article I, section 17 of the Texas Constitution. Later, Sloan Creek II filed its fourth amended objections to the special commissioners' award reasserting its inverse condemnation claim under the Texas Constitution and also asserting inverse condemnation under the Fifth and Fourteenth Amendments to the United States Constitution and 42 United States Code section 1983.[3]

---

[1] The two highways intersect on the boundary that separates the Town of Fairview and the City of McKinney approximately in the center of Collin County, Texas.

[2] Sloan Creek II named the State of Texas as a third-party defendant to its counterclaim. We will refer to the State and the Department simply as TxDOT.

[3] We note that neither plea to the jurisdiction was amended to address the claims under the United States Constitution, nor does any party's brief in the trial court or on appeal address those claims.

The trial court set the pleas to the jurisdiction for hearing on April 24, 2014. Discovery was conducted and NTTA and TxDOT filed separate briefs with evidence supporting their pleas to the jurisdiction. Sloan Creek II filed a response and attached evidence. NTTA and TxDOT then filed replies with additional evidence, and objected to Sloan Creek II's evidence. Sloan Creek II filed a motion to present live testimony at the hearing and a response to motions filed by NTTA and TxDOT to quash deposition notices[4] for many of NTTA's and TxDOT's witnesses. Further, Sloan Creek II moved for additional discovery and an order from the court compelling the discovery.

The trial court conducted a hearing on the discovery and procedural issues in dispute. In its order signed on June 3, 2014, the trial court denied further discovery sought by Sloan Creek II except for the deposition of Christi Glendinning, denied Sloan Creek II's objections and motion to strike NTTA's and TxDOT's evidence filed with their reply briefs, denied all the motions to quash depositions except for the deposition of Glendinning, set deadlines for additional briefing, evidence, and objections to evidence, and set the hearing date. After a lengthy hearing on the pleas, the trial court permitted post-argument responses to the evidentiary objections which both sides filed.

The trial court granted the pleas to the jurisdiction dismissing with prejudice Sloan Creek II's inverse condemnation counterclaim under article I, section 17 of the Texas Constitution in separate orders signed on October 31, 2014. In the orders, the trial court granted all of NTTA's and TxDOT's objections to Sloan Creek II's evidence and denied all of Sloan Creek II's objections to NTTA's and TxDOT's evidence. Sloan Creek II timely perfected this interlocutory appeal.[5] On appeal, Sloan Creek II raises three issues challenging the legal standard applicable

---

[4] The motions to quash are not in our record on appeal.

[5] Sloan Creek II perfected separate appeals from each order, which we consolidated.

to a governmental entity's knowledge that its conduct will cause damage and contends the trial court's determination that there was not a factual dispute was erroneous under whichever legal standard applies. In a fourth issue, Sloan Creek II challenges the trial court's evidentiary rulings. We affirm the trial court's orders dismissing with prejudice Sloan Creek II's counterclaim for inverse condemnation under article I, section 17 of the Texas Constitution.

## II. APPLICABLE LAW

### A. Standard of Review

A plea to the jurisdiction is a challenge to subject matter jurisdiction which is a question of law we review de novo. *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 8 (Tex. 2015). We consider both pleadings and factual assertions, as well as any evidence in the record regarding the jurisdictional issue. *Id.* (citing *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010)). We construe pleadings liberally in favor of jurisdiction with a view to the pleader's intent to ascertain facts that have been alleged affirmatively demonstrating the court's jurisdiction to consider the subject matter. *Id.* Where, as here, "a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider whether evidence in the record raises a fact issue, and if it does, the jurisdictional issue must be resolved by the trier of fact." *Id.* (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227–28 (Tex. 2004)). But if the evidence is undisputed or does not involve a factual dispute, the court rules on the plea as a matter of law. *Id.* (citing *Miranda*, 133 S.W.3d at 228).

We consider circumstantial evidence, but if the party's position is supported "only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists." *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005). We apply the equal inference rule: "'[w]hen the

–4–

circumstances are equally consistent with either of two facts, neither fact may be inferred.'" *Id.* (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 805 (Tex. 1991)).

### B. Damages Requiring Compensation under the Texas Constitution

The Texas Constitution provides that property owners may recover for a taking, damage, or destruction of their property by governmental authority, as follows: "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person . . . ." TEX. CONST. art. I, § 17(a). "To establish a takings claim under Article I, section 17, the claimant must show that a governmental actor acted intentionally to take or damage property for a public use." *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007) (citing *Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001)). A governmental entity that physically damages private property to confer a public benefit may be liable under article I, section 17 if it "(1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action—that is, that the damage is 'necessarily an incident to, or necessarily a consequential result of' the government's action." *City of Dall. v. Jennings*, 142 S.W.3d 310, 314 (Tex. 2004) (quoting *Tex. Highway Dep't v. Weber*, 219 S.W.2d 70, 71 (Tex. 1949); favorably comparing to RESTATEMENT (SECOND) OF TORTS § 8A (1965) ("Intent" means "that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.")).

The governmental entity's knowledge and intent must be determined as of the time it acted, not later with the benefit of hindsight. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 821 (Tex. 2009). And the government's intent must be shown with some "objective indicia of intent" demonstrating the government knew the identifiable harm was substantially certain to result from the government's conduct. *Wilson*, 168 S.W.3d at 830. As a result, not every notice

or claim to the government results in a fact issue about the government's knowledge its conduct was substantially certain to cause the complained of damage. *Id*. at 829–30 (demand letter from lawyer for indemnification of client due to potential flooding insufficient to raise fact issue whether government knew flooding was substantially certain to result from its conduct, stating "This letter may have required the City to investigate, but again is no evidence it knew the advice it received [from engineers] was wrong."). Where, however, an owner contacts high-level government officials involved in a government entity's conduct alleged to be a taking and communicates sufficient information explaining how the conduct is a taking, a fact issue can be created. *See City of Keller v. Hall*, 433 S.W.3d 708, 724–27 (Tex. App.—Fort Worth 2014, pet. denied) (detailing number of contacts with city manager, director of public works, and other city officials and amount of information communicated when combined with other evidence supported conclusion governmental entity knew its conduct was substantially certain to cause damage alleged to be a taking).

## III. ANALYSIS

In their pleas to the jurisdiction, NTTA and TxDOT sought to negate the knowledge required for them to have the necessary intent that Sloan Creek II must establish in order to bring an article I, section 17 takings or damages claim. On appeal, Sloan Creek II challenges the legal standard required for an article I, section 17 claim and argues it produced evidence creating a factual dispute. We will analyze the legal standards proposed by Sloan Creek II, then analyze whether it brought forward evidence creating a factual dispute.

### A. Standard of Intent Regarding Designed Discharge of Rainwater Runoff into Sloan Creek and Resulting Erosion of Creek Banks

Sloan Creek II makes three arguments regarding the standard of intent that it asserts defeat the pleas to the jurisdiction. First, Sloan Creek II argues mere designed discharge of rainwater runoff onto Sloan Creek II's land was "by itself" a taking. Second, Sloan Creek II

argues all it had to prove was that the design intentionally provided for discharge of rainwater into Sloan Creek and that the erosion to the banks of Sloan Creek resulted from that intended design. Third, Sloan Creek II argues the erosion of the banks of Sloan Creek was foreseeable to NTTA and TxDOT from the designed discharge into Sloan Creek so they should have known the erosion would result, which is sufficient to raise a fact issue regarding the knowledge component of NTTA's and TxDOT's intent.

### 1. Mere Designed Discharge of Rainwater into Sloan Creek is not a Taking or Damage "By Itself"

First, Sloan Creek II argues the mere designed discharge of the rainwater runoff into Sloan Creek was "by itself" a taking or damage.[6] For support, Sloan Creek II relies on four cases. Three of the cases cited by Sloan Creek II involve a governmental entity's use of watercourses that caused flooding of property: *Tarrant Regional Water District v. Gragg*, 151 S.W.3d 546 (Tex. 2004) (governmental entity's hundreds of releases of water from dam increased severity of floods of downstream ranch); *Brazos River Authority v. City of Graham*, 354 S.W.2d 99 (Tex. 1961) (governmental entity's construction, maintenance, and operation of dam caused repeated flooding and damage to property); *Jefferson County Drainage District v. Langham*, 76 S.W.2d 484, 488 (Tex. 1934) (governmental entity's improvement of drainage canals caused repeated flooding of downstream land). The fourth case, *City of Amarillo v. Ware*, involved a governmental entity constructing and designing its new storm sewer system to discharge rainwater onto private, agricultural land that was not a watercourse and resulted in washing away soil and fences and ponding water in the field. *City of Amarillo v. Ware*, 40

---

[6] Although obliquely pleaded, neither NTTA nor TxDOT challenge this argument as outside the pleadings. Further, in the absence of special exceptions, a petition must be construed liberally in favor of the pleader such that we "should uphold the petition as to a cause of action that may be reasonably inferred from what is specifically stated . . . ." *Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993); *see also Dall. Area Rapid Transit v. Morris*, 434 S.W.3d 752, 761 (Tex. App.—Dallas 2014, pet. denied) (same).

S.W.2d 57 (Tex. 1931). Each of these cases involved flooding exceeding the capacity of a watercourse or discharge of water not in a watercourse.

An owner of the bed of a watercourse is not entitled to compensation for a governmental entity's use of that watercourse to transport water across the property for a public purpose. *Edwards Aquifer Auth. v. Day*, 274 S.W.3d 742, 759 (Tex. App.—San Antonio 2008) (citing *Domel v. City of Georgetown*, 6 S.W.3d 349, 358 (Tex. App.—Austin 1999, pet. denied)), *aff'd*, 369 S.W.3d 814 (Tex. 2012). When a governmental entity does not damage downstream properties, it is not a taking or damage for a governmental entity to significantly increase discharge into a watercourse. *See Domel*, 6 S.W.3d at 358 (increase of discharge from 250,000 gallons per day to 2.5 million gallons per day not a taking or damage to downstream property owner). But a governmental entity's discharge of water into a watercourse that floods downstream owners can give rise to a takings or damages claim under the Texas Constitution. *See id.*; *Langham*, 76 S.W.2d at 487–88 (recognizing governmental entity's right to collect surface water and discharge it into stream accelerating stream's flow but holding governmental entity responsible for flooding downstream properties). Discharge of water that unnaturally erodes a substantial amount of a downstream owner's land can also be a taking or damage. *See infra* n.13.

Sloan Creek II has not cited any authority supporting its argument that mere use of a watercourse by a governmental entity to transport water across a creek bed is by itself a taking or damage. There is no dispute Sloan Creek has been a watercourse at least since 1872 when it was depicted as a watercourse on a map. There is also no dispute that Sloan Creek has not flooded since the Tollway improvements and Sloan Creek II does not contend that flooding caused its

damage.[7] Accordingly, we conclude NTTA's and TxDOT's designed discharge of rainwater runoff into Sloan Creek is not "by itself" a taking or damage under the Texas Constitution. *See Day*, 274 S.W.3d at 759; *Domel*, 6 S.W.3d at 358.

### 2. Intent to Cause Erosion to Sloan Creek Not Proven by Cause in Fact

Sloan Creek II next argues the intent evident in the design of the drainage system to discharge rainwater runoff into Sloan Creek is all the intent Sloan Creek II must show to state a claim for inverse condemnation if the result of the project is the erosion claimed as damages. The first case Sloan Creek II relies upon is *Gragg*. The supreme court decided in *Gragg* that "construction and operation" of a dam and reservoir caused a "significant change in flooding characteristics" that damaged a downstream ranch. *Gragg*, 151 S.W.3d at 549. The supreme court applied the *Jennings* test to the government's conduct which included the operation of the dam resulting in "releases from the dam." *Id*. at 554. The trial record contained the governmental entity's recordation of "hundreds of [government] releases in an amount sufficient to cause flooding" even if the river was otherwise empty. *Id*. at 552. The *Gragg* court reiterated the longstanding principle that "mere negligence that eventually contributes to property damage does not amount to a taking." *Id*. at 554. Because the case involved recurrent government activity of hundreds of releases of reservoir water resulting in recurrent floods, the supreme court observed, "[i]n the case of flood-water impacts, recurrence is a probative factor in determining the extent of the taking and whether it is necessarily incident to authorized government activity, and therefore substantially certain to occur." *Id*. at 555. The supreme court found "objective

---

[7] In both its *Fourth* and *Fifth Supplemental Objections to Award of Special Commissioners*, Sloan Creek II did not mention flooding when pleading damage caused by Tollway improvements: "The diversion of such storm water runoff onto Sloan Creek's property has caused erosion, water pollution, environmental contamination, and damage to the value of Sloan Creek's property and will continue to do so well into the future." David Petefish, one of Sloan Creek II's owners and a retired geologist, testified to "flash flood conditions" in describing the rapid rise of the depth of the flow in Sloan Creek caused by the Tollway designed discharge of rainwater runoff into Sloan Creek. But the rise was significantly less than the height of the banks of Sloan Creek, and he did not testify the water exceeded the height of the banks.

indicia of intent" in the ranch owner's evidence that "the District's releases actually resulted in unnatural surges of water" that changed the character of the preexisting periodic flooding of the ranch because "the water 'arriv[ed] sooner, flow[ed] faster, and [was] more forceful, deeper, and longer-lasting.'" *Id*. at 555. In addition, the district's knowledge of these matters was reflected in the record containing the government's hydrologist's modeling that predicted greater flooding than would have occurred naturally and a government memorandum recognizing the need to change the gate-release procedures to release more water earlier to avoid increasing the floods of the river. *Id*. at 552.

Contrary to Sloan Creek II's characterization of *Gragg* as not following the *Jennings* standard of intent, the supreme court in *Gragg* embraced *Jennings* stating, "In *City of Dallas v. Jennings* . . . , which we also decide today, we hold that the requisite intent is present when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result." *Id*. at 555 (citing *Jennings*, 142 S.W.3d at 314). The *Gragg* court relied on the governmental entity's own documentation of its hundreds of releases of water in amounts that exceeded the flood capacity of the river even if the river was empty, the modeling by the government's engineer during design that predicted flooding, the recurrent flooding of the ranch following the releases of water, and the internal government memorandum stating there was a need to release water in different ways to avoid flooding. *Id*. at 552. Because *Gragg* involved the governmental entity's repeated conduct (hundreds of releases of water), what the governmental entity knew and when it knew it was appropriately measured with each successive flood. *See id*. at 555; *Pollock*, 284 S.W.3d at 821 ("The government's knowledge must be determined as of the time it acted, not with benefit of hindsight."). *Gragg* does not support Sloan Creek II's positions that (1) it need only prove NTTA'S and TxDOT's design was intended to discharge rainwater runoff into Sloan Creek to establish NTTA and TxDOT are

–10–

liable for the erosion resulting from that, or (2) the erosion subsequent to the design and construction of the Tollway improvements is probative of NTTA's and TxDOT's knowledge at the time of design. *See Pollock*, 284 S.W.3d at 821.

Sloan Creek II also relies on three opinions from the 1930s to support its argument that a public project that results in property damages is sufficient proof of a governmental entity's culpability for a takings or damages claim: *Langham*, 76 S.W.2d at 487–88 (governmental entity that improved drainage liable for downstream flooding without any showing of negligent or intentional conduct by the governmental entity); *Ware,* 40 S.W.2d at 60 ("[T]he language used in section 17 of article 1 of the Constitution . . . . is a plain, pointed, definite statement of a rule which prevails in this state, and the liability for compensation of property damaged or taken is not predicated upon the theory that the tortious act was done negligently or intentionally."); and *City of Waco v. Rook*, 55 S.W.2d 649 (Tex. Civ. App.—Waco 1932, writ dism'd) (new dam and reservoir changed the direction, volume, and velocity of water discharged into a river flooding and eroding downstream owner; not even negligence required to be shown). The culpability standards in these opinions have been overruled implicitly by the supreme court starting with its 1949 opinion in *Texas Highway Department v. Weber*, 219 S.W.2d 70, 70–71 (Tex. 1949). The supreme court reasoned a government's conduct must be more than "simply one sounding in tort" otherwise government would be "responsible for all injuries or damages occasioned by its agents in the negligent performance of their official duties." *Id.* at 71. More recently, in *Jennings*, the supreme court set forth the standard under the Texas Constitution necessary to prove a governmental entity's culpability for its conduct:

> We therefore hold that when a governmental entity physically damages private property in order to confer a public benefit, that entity may be liable under Article I, Section 17 if it (1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action — that is, that the damage is 'necessarily an incident to, or necessarily a consequential result of' the government's action.

–11–

*Jennings*, 142 S.W.3d at 314 (citing *Weber*, 219 S.W.2d at 71). It is certainly necessary for an owner to establish cause in fact as a prerequisite to a claim for inverse condemnation. *Pollock*, 284 S.W.3d at 821 ("A governmental entity is substantially certain that its actions will damage property only when the damage is 'necessarily an incident to, or necessarily a consequential result of the [entity's] action.'") (quoting *Jennings*, 142 S.W.3d at 314). But cause in fact without meeting the *Jennings* standard of knowledge is not enough to prove a governmental entity's intent as demonstrated by each of the supreme court's opinions after *Jennings* where the standard of culpability of a governmental entity's article I, section 17, taking or damage involving physical damage to property has been at issue. *See Harris Cty. Flood Control Dist. v. Kerr*, No. 13-0303, 2015 WL 3641517, at *3 (Tex. June 12, 2015) (flooded owners prevailed on *Jennings* standard by showing government adopted Corps of Engineer findings of necessary mitigation then did less mitigation which caused flooding); *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 537 (Tex. 2013) (reaffirming *Jennings* standard); *Pollock*, 284 S.W.3d at 821 (same); *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007) (articulating *Jennings* standard not met "[w]hen the government acts pursuant to colorable contract rights, it lacks the necessary intent to take under its eminent-domain powers and thus retains its immunity from suit."); *City of Keller v. Wilson*, 168 S.W.3d at 829–30; *City of Arlington v. State Farm Lloyds*, 145 S.W.3d 165, 168 (Tex. 2004) (articulating *Jennings* standard); *Gragg*, 151 S.W.3d at 555 (same).

We conclude Sloan Creek II's reliance on its evidence that the erosion necessarily resulted from NTTA'S and TxDOT's intended design to discharge rainwater runoff into Sloan Creek is not enough to meet the *Jennings* standard of the knowledge component of intent.

### 3. Foreseeability or 'Should Have Known' Erosion Would Result from Discharging Rainwater into Sloan Creek Is Insufficient Knowledge for Intent

Sloan Creek II argues NTTA and TxDOT are culpable for eroding the banks of Sloan Creek if erosion of the creek generally was "clearly foreseeable" as a matter of "engineering," quoting *Brazos River Authority*, 354 S.W.2d at 106. Sloan Creek II makes oblique reference to its expert witnesses' testimony that NTTA's and TxDOT's engineers designed the drainage system to discharge rainwater into Sloan Creek and should have known the impact of the design on Sloan Creek.

Sloan Creek II also relies on *Gragg*, asserting the supreme court used an "inevitability of the outcome" standard: that if the damages are shown to be an inevitable result of a governmental entity's design or construction of a project, then that governmental entity is subjected to liability for a taking or damage under the Texas Constitution. In *Gragg*, the supreme court observed that "the reservoir's physical characteristics . . . were also significant and inevitably altered the characteristics of floods at the Ranch." 151 S.W.3d at 555. The court concluded, "We hold that the evidence in this case supports the trial court's findings that the extensive damage the Gragg Ranch experienced was the inevitable result of the reservoir's construction and of its operation as intended." *Id*. These statements are the *Gragg* court's characterization of the causal relationship between the governmental entity's operation of the dam and the flooding of the downstream property. The supreme court, however, did not substitute inevitability of outcome for the *Jennings* standard. Instead, the *Gragg* court applied the *Jennings* standard as we explained above. *Id.* (citing *Jennings*, 142 S.W.3d at 314).

The supreme court made this explicit the year after it decided *Gragg* when it considered an owner's argument that flooding was the inevitable result of a design. In *City of Keller v. Wilson*, the city approved a developer's drainage ditch ending at one edge of a privately owned

property not connected to a culvert the city built at the opposite edge of the property to receive rainwater runoff. 168 S.W.3d at 808. The supreme court distilled what the property owners had to prove: "The critical question in this case was the City's state of mind—the Wilsons had to prove the City knew (not should have known) that flooding was substantially certain." *Id*. at 829. The supreme court explained why the record failed to show there was evidence the city knew that flooding the private property was substantially certain from the storm water discharged through the drainage system:

> Moreover, when a case involves scientific or technical issues requiring expert advice (as this one does), jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so. Here, it was uncontroverted that three sets of engineers certified that the revised plans met the City's codes and regulations—and thus would not increase downstream flooding. The same firm that drew up the original Master Plan certified the revised one; unless the City had some reason to know the first certification was true and the second one was false (of which there was no evidence), there was only one logical inference jurors could draw.

*Id*. (footnote omitted). Even though the property owners presented expert testimony that the flooding was inevitable, the court still required evidence that the governmental entity knew this fact, stating, "None of the evidence cited by the court of appeals showed the City knew more than it was told by the engineers. The Wilsons' expert testified that flooding was (in his opinion) inevitable, but not that the City *knew* it was inevitable." *Id*. According to *Wilson*, inevitability of damage may satisfy the requirement that the damage be substantially certain to result from the governmental entity's conduct, but it is not enough to establish a governmental entity's intent without evidence the governmental entity knew of the inevitability of the damage.

This Court's opinion in *Dalon v. City of DeSoto*, 852 S.W.2d 530 (Tex. App.—Dallas 1992, writ denied) is consistent with *Jennings* and its progeny. In *Dalon*, homeowners complained the city caused excessive erosion of the bank of a creek abutting their property thereby eroding about ten feet of their yard. *Id.* at 532. The homeowners claimed the city had

–14–

approved upstream development and routed storm sewers into the creek discharging storm water there when the city should have built other storm sewers to divert the water elsewhere. *Id*. The city's director of public works testified that a fifty-year rain event caused the erosion and that the erosion was a natural occurrence. *Id*. at 532–33. The homeowners' expert testified "It is not normal erosion however, which has caused the loss of 10 feet of the Dalon's [sic] backyard, but rather, the extreme, rapid erosion . . . ." *Id*. at 533. The homeowners asserted inverse condemnation[8] alleging the failure to maintain the creek bank "as well as approval of upstream development result[ed] in increased drainage along" the creek resulting in the increased erosion. *Id*. at 538. We analyzed the homeowners' inverse condemnation claim stating it required a showing that "the State intentionally performed certain acts." *Id*. We concluded the homeowners' claim that the storm sewer system's designed discharge of rainwater runoff into the creek merely stated a claim of negligence against the city and did not raise a fact issue regarding "an intentional action by a city official" to take the creek bank. *Id*. Thus, our opinion in *Dalon* used an intent standard in anticipation of and consistent with *Jennings* and its progeny based on the same basic concept that erosion damages are not a constitutional taking or damage unless there is evidence of intentional conduct on the part of the governmental entity with reference to the erosion for which compensation is sought.

The supreme court has rejected the standards suggested by Sloan Creek II. *See Pollock*, 284 S.W.3d at 821 ("The governmental entity's awareness of the mere possibility of damage is no evidence of intent."); *City of Keller v. Wilson*, 168 S.W.3d at 829 ("The critical question in this case was the City's state of mind—the Wilsons had to prove the City knew (not should have

---

[8] The homeowners also asserted a negligence claim which the *Dalon* court analyzed separately. Supporting their negligence claim the homeowners presented expert testimony that the city had not "'properly maintained or repaired [the creek bank] with slope protection, retaining wall or other erosion protection measures to hold the land in place.'" *Id*. at 533.

known) that flooding was substantially certain."); *id.* at 830 ("the Wilsons had to prove—not that the City might have disbelieved the engineers' reports, but that it did"). Instead, for a governmental entity to be culpable for a taking or damage under article I, section 17 there must be evidence of objective indicia that the governmental entity whose conduct is under scrutiny knew its conduct was causing the damages complained of or knew the specific property damage was substantially certain to result from its conduct. *See Kerr*, 2015 WL 3641517, at *3; *Kopplow Dev., Inc.*, 399 S.W.3d at 537; *Pollock*, 284 S.W.3d at 821; *Holland*, 221 S.W.3d at 643; *Wilson*, 168 S.W.3d at 829–30; *State Farm Lloyds*, 145 S.W.3d at 168; *Gragg*, 151 S.W.3d at 555; *Jennings*, 142 S.W.3d at 314. This is the standard by which we will measure the evidence of intent in the case before us.

## B. The Record Regarding NTTA's and TxDOT's Knowledge

In addition to the challenges to the legal standard of intent discussed above, Sloan Creek II challenges the trial court's granting of the pleas to the jurisdiction on the basis that even if the *Jennings* standard applies to this case, the record reveals a factual dispute about NTTA's and TxDOT's knowledge regarding whether the design to discharge rainwater runoff into Sloan Creek was substantially certain to erode the bank to a greater extent and at a greater rate than would otherwise have occurred. We will first consider an evidentiary matter, then analyze the parties' arguments regarding the evidence in the record.

### 1. Admissibility of Petefish's and Walton's Testimony

In order to analyze this evidence, we consider here Sloan Creek II's complaint in its fourth issue that the trial court abused its discretion when it sustained NTTA's and TxDOT's objections to certain testimony.[9]

---

[9] In its fourth issue, Sloan Creek II challenges several evidentiary rulings, but it does not complain about the limitations on its discovery efforts set by the trial court in the June 3, 2014 order.

At trial and summary judgment, evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam) (trial); *Scruggs Mgmt. Servs., Inc. v. Panasonic Comm'ns & Sys. Co.*, No. 05-99-00518-CV, 2000 WL 1093230, at *3 (Tex. App.—Dallas Aug. 7, 2000, pet. denied) (not designated for publication) ("The same standards and principles of evidence applicable in a trial on the merits apply equally in a summary judgment proceeding.") (citing *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997)). The standards of review of a plea to the jurisdiction are the same as a traditional motion for summary judgment. *Miranda*, 133 S.W.3d at 228. Therefore, in this appeal of a plea to the jurisdiction we review the trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (trial). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002); *Garcia v. Martinez*, 988 S.W.2d 219, 222 (Tex. 1999).

Sloan Creek II presented evidence regarding NTTA's and TxDOT's knowledge primarily from Petefish, the retired geologist owner of Sloan Creek II, and Dr. Raymond Walton, Sloan Creek II's expert in hydrology. Among other matters, NTTA and TxDOT objected to numerous portions of Petefish's and Walton's testimony as being conclusory, speculative, and lacking a proper factual predicate citing *Pollock*. Conclusory or speculative opinion testimony, which includes expert opinion evidence that does not have an adequate basis, is not relevant evidence. *Id.*[10] Sloan Creek II contends NTTA's and TxDOT's objections are too global because by the

---

[10] The *Pollock* court stated,

> [A]lthough expert opinion testimony often provides valuable evidence in a case, "it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." Burrow v. Arce, 997 S.W.2d 229, 235 (Tex. 1999). Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact "more probable or less probable." *See* TEX. R. EVID. 401. This Court

end of the specific objections they challenged the entirety of Petefish's and Walton's testimony about what NTTA and TxDOT knew or should have known.

NTTA and TxDOT made specific objections to specific portions of Petefish's and Walton's testimony, even though it is true in the aggregate the objections address almost all of Petefish's and Walton's testimony regarding NTTA's and TxDOT's knowledge. The objections are, nevertheless, specific and the trial court could not have misunderstood what testimony NTTA and TxDOT challenged and why. Sloan Creek II further responds by arguing specific ways that there were adequate bases for Petefish and Walton to render their opinions as a geologist and hydrologist, respectively, based on the facts they had.

NTTA and TxDOT complain Petefish's and Walton's testimony attributing to NTTA and TxDOT whatever the outside consultants—the consulting engineers and the appraiser—knew is speculative and conclusory because there is no evidence in the record that such information was communicated or transmitted to any of NTTA's and TxDOT's employees including their engineers. Additionally, NTTA and TxDOT object that Petefish and Walton provide no factual basis for the conclusion from the existence of certain bridge inspection reports[11] that a TxDOT geologist or geotechnical engineer ever saw the bridge reports. We have reviewed in detail Petefish's and Walton's testimony and the parties' arguments. Petefish and Walton do not demonstrate a factual basis to opine about what highway design engineers know or should know,

has labeled such testimony as "incompetent evidence," and has often held that such conclusory testimony cannot support a judgment.

*Pollock*, 284 S.W.3d at 816 (quoting *Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 232 (Tex. 2004)).

[11] The bridge inspection reports contain notes of conditions of the structure and the soil where the structure contacted the soil.

what government entities in the abstract know or should know, or even what every lay person knows or should know about hydrology and erosion.[12]

Petefish and Walton do not provide a basis in this record demonstrating they know what highway design engineers should know given a certain set of facts; they did not provide evidence the consulting engineers and NTTA's and TxDOT's employee-engineers actually knew the information that formed the basis for Petefish's and Walton's conclusions; they did not set out a standard demonstrating those engineers were likely to or should have acquired the information or should have run the computer modeling of the rainwater flow for one-month, two-month, one-year, and two-year rain events; and they did not relate this information to explain how and why those engineers should have known or drawn the same analysis and conclusions as Petefish and Walton. Similarly, Petefish and Walton did not provide a factual basis for attributing to NTTA and TxDOT knowledge they stated the consulting engineers and appraiser possessed. For the same reasons, to the extent Petefish and Walton meant by their testimony that NTTA's and TxDOT's employee-engineers directly knew or should have known the information forming the basis for Petefish's and Walton's testimony, Petefish and Walton did not provide a factual basis for such opinions. Finally, Petefish and Walton did not provide a factual basis to conclude a TxDOT geologist or geotechnical engineer had or should have reviewed the bridge inspection reports.

On this record we overrule the portion of Sloan Creek II's fourth issue complaining of the trial court's rulings on Petefish's and Walton's testimony regarding what NTTA's and TxDOT's employee-engineers and consulting engineers knew or should have known. This does not exclude Petefish's and Walton's testimony regarding causation of erosion.

---

[12] In some instances in his deposition, Walton conceded he had not formed an opinion about what highway design engineers should know. But NTTA's and TxDOT's objections cover each aspect of both witnesses' testimony about what the highway design engineers knew or should have known.

### 2. No Evidence in This Record NTTA and TxDOT Knew with Substantial Certainty Their Conduct Would Increase the Amount and Rate of Erosion of Sloan Creek

Causing damage is what a governmental entity must know is substantially certain under *Jennings* and its progeny, so we will recite in detail Petefish's and Walton's testimony about causation and how they claim NTTA and TxDOT knew their design of the Tollway improvements would result in erosion of Sloan Creek on Sloan Creek II's property. Because Sloan Creek II makes an alternative argument that its experts' opinions are inferences that should be drawn from the evidence, we will include the knew-or-should-have-known testimony to which we have affirmed the trial court's ruling sustaining NTTA's and TxDOT's objections in order to resolve all of Sloan Creek II's arguments. In addition, Petefish's and Walton's testimony about what NTTA and TxDOT knew is intermingled with their causation testimony, so reciting the excluded testimony is part of the context for their entire testimony.

### a. Design Mitigated Flooding Potential, not Erosion Potential

Fundamental to this case is the undisputed fact that although NTTA and TxDOT contract for their consulting engineers to study a project's flooding impact off of a right-of-way as they build highways, they do not contract for studies and analysis of a project's erosion impact off of the right-of-way. Sloan Creek II accused NTTA and TxDOT of willful ignorance about its highway designs' erosion effects off of the rights-of-way, but there is no evidence of that in this record.[13] It is also undisputed in this record that the Tollway improvements did not cause Sloan

---

[13] There is indication in the record from NTTA's and TxDOT's engineers and arguments of counsel that NTTA's and TxDOT's reason for not obtaining and evaluating data pertaining to erosion off the right-of-way is they understand the law to not hold them liable for erosion damages. However, Texas authorities have treated erosion as recoverable damages under Article I, section 17, of the Texas Constitution. *See Ware*, 40 S.W.2d at 58–59 (discharge from storm water drainage system that "washed" away soil, crops, and fence compensable damages under Texas Constitution); *Rook*, 55 S.W.2d at 650 (four acres "washed away" into river and crops and fence washed away were compensable takings or damages under Texas Constitution). When we denied recovery for erosion of ten feet of a residential yard in *Dalon* it was not because erosion as a type of damages was not recoverable, but because there was no evidence of the governmental entity's intent. *See Dalon*, 852 S.W.2d at 537–38. Further, even if NTTA and TxDOT were not liable for erosion under the Texas Constitution, erosion can serve as the basis for an inverse

–20–

Creek to flood outside of its banks and no evidence controverts NTTA's and TxDOT's evidence of their consulting engineers' modeling that the design did not exceed one-half the flood capacity of Sloan Creek. For the following reasons, there is no evidence in this record that the consulting engineers, NTTA's and TxDOT's employee-engineers, or anyone else employed by NTTA and TxDOT knew their conduct would increase the amount and rate of erosion of the banks of Sloan Creek.

### b. NTTA's and TxDOT's Testimony of Lack of Knowledge of Erosion Potential

NTTA and TxDOT presented testimony from its employee-engineers that they did not design the Tollway improvements and that the consulting engineers who were contracted to do so never discussed with NTTA and TxDOT the potential for the design of the Tollway improvements to result in erosion of Sloan Creek, including the soil characteristics or erosion potential of the banks of Sloan Creek. The consulting engineers used computer software that models complex water flow through culverts and streams to analyze fifty-year and one hundred-year rain events in order to design the Tollway improvements to mitigate flooding on the right-of-way so the post-project flooding potential off the right-of-way would not exceed the pre-project conditions. There were no similar erosion standards used, and erosion potential off right-of-way was not analyzed.

---

condemnation claim under the Fifth Amendment to the United States Constitution. *See Boling v. United States*, 220 F.3d 1365 (Fed. Cir. 2000) (reasonably foreseeable erosion caused by government that substantially encroaches on private property can constitute compensable taking); *Owen v. United States*, 851 F.2d 1404 (Fed. Cir. 1988) (government dredging that increased flow of river eroding property causing house to collapse into river could constitute compensable taking); *Banks v. United States*, 88 Fed. Cl. 665 (2009) (as a result of construction and maintenance of jetty that caused erosion to shoreline properties, government was liable to owners for part of erosion). Although it may be appropriate for the supreme court to set a standard for the threshold at which erosion becomes a takings under the Texas Constitution such as "substantial encroachment" (as opposed to "mere inches") that exceeds natural erosion—*see Boling*, 220 F.3d at 1372–73—we see nothing inherent in erosion that makes it a damage for which recovery should not be allowed under article I, section 17.

NTTA's lead employee-engineer on this project, Mark Bouma, testified to the lack of any information about erosion provided by the consulting engineers, as follows:

> Based upon the recommendations of our consultants, the NTTA did not believe that the SRT project would cause flooding or other adverse downstream impacts on the Sloan Creek II, LLC property. I do not recall receiving any inquiry or being involved in any discussion about impact on Sloan Creek downstream of US 75 from water runoff until after learning of the claims of damage made by Sloan Creek II, LLC in this case. I have reviewed my files and did not see any communication on this topic. I further consulted other NTTA employees who might have been involved in any such communication. No other employees recall discussion about impact to Sloan Creek downstream of US 75. The NTTA was not aware that the SRT project would cause the type of damage to Sloan Creek that is now being alleged by Sloan Creek II, LLC. Similarly, the NTTA was not aware that the type of damage to Sloan Creek that is now being alleged by Sloan Creek II, LLC was substantially certain to result from the SRT project.

TxDOT's employee-engineers testified in similar fashion. One of TxDOT's engineers explained why TxDOT studies water surface profiles and velocities within the right-of-way but not off the right-of-way, testifying, "We cannot model the entire world. And downstream is a long way. . . . [It] [g]oes to the Gulf of Mexico."

### c. Walton's Testimony Regarding Engineering Knowledge NTTA and TxDOT Should Have Had from Rain Water Flows

To controvert NTTA's and TxDOT's evidence, Sloan Creek II supplied Walton's affidavits in which he testified the changes created by the Tollway improvements added more than forty acres of impervious concrete to the watershed that drained into Sloan Creek, so there were forty acres less ground to absorb the rainfall. In addition, the concrete drainage system delivered the rainfall much more quickly to the point of discharge into Sloan Creek than natural flow of water across the pasture land. He criticized the detention pond in the drainage system immediately before the discharge point into Sloan Creek because it had a large outflow pipe at the bottom so it would reduce water flow only in large rain storms and not impede the flow of more frequent, lesser rains.

Walton testified that he ran computer modeling of flows for storms that occur on average once every two or three months (50 to 120 percent increased peak flow) as well as less common storm events that occur on average once a year (69 to 147 percent increased peak flow). He criticized the hydraulic report for the project as measuring only 50-year and 100-year rainfall events because there would not be a significant increase in volumes, velocities, and peak flows from such events because those measurements "would have been high both before and after this project was constructed." Walton then opined that if the engineers had run computer models of the more frequent rain events, "assuming they were run correctly with readily available information, [the models] would have told the engineers working for NTTA/TxDOT that the project would cause a significant increase in volumes, velocities, and peak flows in Sloan Creek during any of the more common storm events" occurring every two years or less and "even more significant increase in the peak flows during each of the most common storm events" occurring every month or two. Walton concludes NTTA's and TxDOT's engineers had all the data available to run the calculations he did and could have known their design would substantially increase the volume, velocity, and depth of peak flows for the more frequent rainfall events, stating:

> For these reasons, it is my opinion that TxDOT's and NTTA's engineers who designed the roadways and drainage and culvert systems for SH121 and US75 had all of the data available to them in order to know that their design would increase the peak flows, depths and velocities of flows in Sloan Creek and the frequency with which those larger flows occur, or know that such larger flows and higher frequency were the substantially certain result of their design. Such larger flows and higher frequency of large flows were and are the inevitable result of TxDOT's and NTTA's design, are permanent and have been recurring in the past and will continue to recur in the future.

Walton's testimony provides no evidence that at the time of the design and construction of the Tollway improvements anyone associated with the design knew the modest rainfall flow data about which Walton testified. Walton testified that the software utilized by the consulting

engineers was capable of modeling the flow of Sloan Creek for one-month, two-month, and one-year rainfall events and that Walton actually performed that function with the same software. But the record reflects NTTA's and TxDOT's consulting engineers did not model those rain events but instead modeled fifty-year and one hundred-year rain events (because they were analyzing for floods, not erosion). Walton acknowledged that is all the highway design engineers studied. So there is no factual dispute that neither NTTA's and TxDOT's employee-engineers nor the consulting engineers knew the modest rain flow data about which Walton testified.

### d. Petefish's Testimony Regarding Knowledge NTTA and TxDOT Should Have Had from Engineering Regarding Erosion Potential

Petefish testified that the increased erosion to the bank of Sloan Creek was a "direct and inevitable result of the increased volume, velocity and peak flows" due to the Tollway drainage system. He opined that it is a well-known principle that "increasing the volume and speed of water flowing across a piece of land will increase the rate at which the water erodes a channel through that land."[14] He then opined as to NTTA's and TxDOT's knowledge that the Tollway would substantially increase the erosion of Sloan Creek:

> NTTA and TxDOT were aware of this principle; they knew that the project would increase the flows in Sloan Creek and were aware that these flows would substantially increase erosion of that creek. NTTA and TxDOT's own documents, deposition testimony, and actions confirm their awareness that the project, as designed and constructed, would increase the erosion of Sloan Creek. Besides, noticeable erosion was easily visible in Sloan Creek on the existing TxDOT right of way prior to construction of the project. And I personally warned NTTA's appraiser, in 2008 prior to construction beginning, that if the project was not constructed in a way to prevent erosion, it would erode the creek and damage a natural spring and black walnut tree on my property.

---

[14] Petefish provided his data on which he and Walton relied. He characterized several measured rapid rises in the water level less than three feet "as flash flood conditions that did not occur before the construction of the project" but his photographs depict the creek banks as twelve to fifteen feet high. He explained his opinion of the mechanics of the erosion as the "rapidly rising volume, velocity and peak flows in the creek erode the lower banks of the creek, causing undercutting and causing trees and large chunks of the banks to collapse and wash away."

Petefish testified that NTTA and TxDOT had constructed projects in the soil types that comprise Sloan Creek and so were "thoroughly familiar" with that "very same soil."

As to NTTA's and TxDOT's knowledge, Petefish opined that NTTA and TxDOT "knew or were substantially certain that the banks of Sloan Creek were erodible and that the depth, velocity, and time of concentration of the additional surface water the project would pipe from SH121 and US75 into Sloan Creek from the design and construction of the project would cause Sloan Creek to erode at a much greater rate." He supported that conclusion with an opinion that the mere existence of Sloan Creek "is evidence that would tell any geologist, engineer, or even layman that the material in and around Sloan Creek is erodible when water flows over it." He also opined that creeks stabilize at the natural conditions to which they are subjected, but begin to erode again when subjected to higher volumes and velocities of water. Petefish traced the history of geology to demonstrate the principal of geology that water runoff in streams will result in stream systems "with just the size and spacing required to move the water" with maximum efficiency so additional water added to an existing stream will increase the erosion of the ground to adapt to the additional volume and velocity of water. Petefish opined these concepts "have been well-known, particularly in the geologic and engineering communities, for at least the last 600+ years."

According to Petefish, NTTA and TxDOT knew these concepts, so they knew Sloan Creek's geological composition was susceptible to erosion, and knew increasing the volume and velocity of rainwater discharged into Sloan Creek would increase the erosion of it. Petefish expressed this as actual knowledge, stating, "It is therefore my opinion that, like the rest of modern civilization, both NTTA and TxDOT knew these concepts as well and knew that changing the volume, velocity, and peak flows of the water in Sloan Creek would significantly

–25–

increase the rate of erosion of that creek." He also stated his opinion in terms of what NTTA and TxDOT could have known from the information in their possession:

> The information in their possession before construction began told NTTA and TxDOT that the surface water the project was going to collect and divert into Sloan Creek would cause greatly increased erosion. Any engineer familiar with the basics of hydraulics and hydrology, such as those who designed and constructed this project on behalf of NTTA and TxDOT, would know that such an increase in peak flows, depths, and velocities of flows in Sloan Creek during the area's most common storm events would cause significantly-increased [sic] erosion of the creek.

TxDOT's geotechnical engineer, John Delphia, testified that TxDOT does not usually, and did not in this instance, sample and analyze stream bank materials outside of its right of way. According to Delphia, obtaining and analyzing soil data off the right-of-way would have been necessary for TxDOT to know or be substantially certain of the conditions of Sloan Creek to which Petefish testified. Delphia testified Petefish was wrong when he testified that the mere existence of a creek informs anyone that the soil in that area is "highly erodible." Delphia testified,

> Even the hardest of rock materials are erodible, and erosion of those materials can form creeks and rivers, given proper conditions, such as time of exposure. Without knowing the allegedly "highly erodible" nature of the creek banks, TxDOT could not have known, or even been substantially certain, of the erosion Mr. Petefish alleges.

There are several gaps in Petefish's testimony between what Sloan Creek II contends are facts and what Sloan Creek II argues NTTA's and TxDOT's employee-engineers and consulting engineers knew or should have known from those facts. Because of these gaps, we cannot agree with Petefish's conclusion that NTTA and TxDOT knew the erosion potential the design might have on Sloan Creek or know the design was substantially certain to cause greater erosion than would naturally occur.

We measure a governmental entity's knowledge of an alleged taking at the time of the government's conduct that caused the alleged taking. *Pollock*, 284 S.W.3d at 821. When the

–26–

conduct includes operation of a structure in addition to its design, the supreme court has included what a governmental entity learned as it operated the structure. *See Gragg*, 151 S.W.3d at 552, 555 (governmental entity's knowledge included documentation of its recurrent releases of water from dam it constructed where each release was sufficient to exceed the flood capacity of the river). Here there is neither allegation nor evidence NTTA and TxDOT operate the Tollway improvements with recurring conduct that causes the erosion the way in *Gragg* a dam was operated to cause flooding. Accordingly, the conduct at issue is NTTA's and TxDOT's design and construction of the Tollway improvements alleged to have caused the unnatural erosion of Sloan Creek.

The first gap in Petefish's testimony is the lack of any evidence that at the time of the design and construction of the Tollway improvements anyone associated with the design knew the modest rainfall flow data about which Walton testified. Our discussion of Walton's testimony applies equally to Petefish's testimony that the highway design engineers did not utilize the flow-modeling software to model the flow through the drainage system and the resulting flow of Sloan Creek for one-month, two-month, and one-year rainfall events. Petefish testified it was the one-month, two-month, and one-year rainfall events that are causing the erosion that exceeds the natural erosion of Sloan Creek. It is undisputed in this record NTTA's and TxDOT's consulting engineers did not model those rain events. So there is no factual dispute in this record that neither NTTA's and TxDOT's employee-engineers nor the consulting engineers knew the modest rainfall flow data on which Petefish's testimony depends.

The second gap in Petefish's testimony is the lack of any evidence that at the time of the design and construction of the Tollway improvements that anyone associated with the design knew the composition of the banks of Sloan Creek. The undisputed testimony was that the off the right-of-way soils were not tested. According to Petefish, knowledge of the geology of Sloan

Creek was necessary information for the engineers to have if they should have known the discharge would unnaturally erode Sloan Creek. Further, even Petefish testified in his deposition to a significant difference of the composition of Sloan Creek just between the bottom of the channel ("the bottom of the channel was virtually nonerosive") and the banks (highly erodible marley chalk).[15] As for Petefish's testimony that the soil was the same for miles around, if that was known to NTTA's and TxDOT's employee-engineers or consulting engineers, at most it would result in the conclusion the engineers should have investigated the situation. But Petefish's assertion the engineers should have investigated off right-of-way soil composition does not constitute evidence NTTA and TxDOT knew the composition of the soil that should have been investigated. *See Wilson*, 168 S.W.3d at 830 (notice of information "may have required the City to investigate, but again is no evidence it knew" the truth of the matter asserted in the letter).

> ### e. NTTA's and TxDOT's Knowledge from Bridge Inspection Reports, Pre-existing Erosion of Detention Pond, and Riprap at Discharge into Sloan Creek

Petefish further supported his opinion with several facts to show NTTA and TxDOT knew the soil conditions of Sloan Creek on the right-of-way so they should have known the soil conditions of Sloan Creek off the right-of-way. Petefish relied on pre-project TxDOT bridge inspection reports noting in more than one location there was "white colored efflorescence, a rust colored efflorescence, and heavy efflorescence in and around cracks on barrel walls, abutment walls, headwalls, wingwalls, and concrete top slabs." Petefish opined that NTTA's and TxDOT's geologists and geotechnical engineers should have known from these observations that a chemical reaction was producing sulfuric acid breaking down the material comprising the creek

---

[15] There is no evidence in this record whether the impermeable bottom of the channel which prevented vertical erosion contributed to the lateral erosion of the banks of Sloan Creek.

bank making the creek more erodible and that rainwater discharge from this the project would erode Sloan Creek. Petefish's opinion about this is as follows:

> The white efflorescence of salt being deposited on the bridge structures is evidence of dissolved salts in the groundwater and reaction with the materials in the concrete. The rust colored efflorescence is evidence of salts in the seepage and reaction with the rebar in the concrete. The presence of large amounts of salt is easily identifiable evidence that a chemical reaction is occurring within the bank material and is producing sulfuric acid, which breaks down the bank material and makes it more erodible than it already was. Knowing the composition of the material (clay/wacke) in the stream banks, strength of material, orientation of bedding, direction of channel flow, grade of the channel, velocities and depth of flow, degree of fracturing (Rock Quality Designation), joint widths, and joint roughness, tells NTTA and TxDOT's geologists and geotechnical engineers that the banks of Sloan Creek are highly erodible and will erode with the depth, velocity and time of concentration of the water being piped from SH121 and US75 (the project) into Sloan Creek or that this would be the substantially certain result of NTTA and TxDOT's design, construction, and operation of the project and its accompanying drainage and culvert systems. The white efflorescent salt appearing on the bridge and associated outcrops is evidence of the sulfide breakdown in the outcrop with the formation of gypsum. The sulfide oxidizes to form sulfuric acid that attacks the carbonate cement in the outcrop and the concrete culverts. The removal of the carbonate and later dissolution of the gypsum lowers the shear strength and increases the erodibility of the material in the outcrop, as noted at the inlets and outlets of the culverts. As the outcrop breaks down, the clays (montmorillonite) tend to shrink on drying and swell on hydration. The differential shrink/swell completely breaks up the exposed outcrop. NTTA and TxDOT's geologists or geotechnical engineers had to know upon seeing the efflorescence on the bridge structures that the creek bank material was highly erodible and would erode when water from SH121/US75 (the project) was piped into the creek.

Petefish also based his opinion of NTTA's and TxDOT's knowledge on provisions in the design to protect the Tollway structures and easement from erosion. Petefish noted that NTTA's in-house engineer's testimony that concrete slope protection, called riprap, at the end of certain box culverts was to prevent erosion where water exited the box culvert was proof that NTTA knew the volume and velocity of water its design would discharge would erode Sloan Creek further down the creek on Sloan Creek II's property. Petefish testified,

> If NTTA and TxDOT knew that, without a concrete apron, erosion would occur as water flows out of their culvert, it is my opinion that they also knew that very same water flow would also cause erosion after it left the culvert and entered a

–29–

narrower channel that was not lined with concrete. In order to prevent erosion for a few feet outside their culvert, they concrete-lined a small portion of the very same stream channel they now claim they did not know would erode. It is my opinion both NTTA and TxDOT did know Sloan Creek would erode after completion of the project, evidenced in part by the fact that they felt the need to install a concrete apron to prevent erosion within their easement.

Petefish also relied on construction photographs depicting the condition of features after previous construction that had eroded: an eroded hole and erosion of a certain pool upstream of a culvert leading to Sloan Creek II's property. From the existence of these conditions he concluded, "NTTA and TxDOT knew, at least as early as 2008 when construction began, that Sloan Creek was a highly erodible creek and that piping additional water at faster speeds into the creek would greatly increase the rate of further erosion."

TxDOT's geotechnical engineer, Delphia, testified no TxDOT geologist or geotechnical engineer reviewed any bridge inspection reports relied upon by Walton and Petefish. In addition, Delphia disputed Petefish's analysis and conclusions from what was noted in the bridge inspection reports summarizing his conflicting conclusions that the reports contain nothing unusual and do not provide information that with certainty indicates the composition of the banks of Sloan Creek as opposed to the composition of the concrete structures and the fill material placed around them during construction. TxDOT provided excerpts of Stan Hopfe's deposition, a TxDOT engineer, who, similar to Delphia, disputed Petefish's conclusions from the bridge inspection reports. Hopfe testified that the bridge reports regarding the pre-existing structure demonstrate only that a forty-year-old structure with a fifty-year life was coming to the end of its life with cracks in the concrete members allowing water to infiltrate and react with the steel rebar and composition of the concrete resulting in the discoloration and deposits on which Petefish based his conclusions.

Petefish's testimony about soil conditions on the right-of-way do not provide evidence NTTA and TxDOT knew what the soil conditions were off the right-of-way downstream in

Sloan Creek. TxDOT's geotechnical engineer testified TxDOT's geologists and geotechnical engineers did not review the bridge inspection reports. So even if there was information in the bridge inspection reports that could form a basis for Petefish's opinions about the soil composition of the banks of Sloan Creek, there is no factual basis in this record to conclude TxDOT's geologists and geotechnical engineers knew it. Even if Petefish's testimony was admissible regarding what the highway design engineers should have known from the pre-construction erosion of a detention pond and the significance of the design of the riprap at the discharge point of certain box culverts, those were soil conditions on the right-of-way. Delphia testified that obtaining and analyzing soil data off the right-of-way would have been necessary for TxDOT to know or be substantially certain of the conditions of Sloan Creek asserted by Petefish to exist. Delphia's testimony in that regard is not controverted. The testimony of Delphia and Hopfe demonstrates there was more than one possible conclusion to draw from the information regarding material in the right-of-way if they had known it. All three of these matters, therefore, raise at most notice to NTTA and TxDOT to investigate soil conditions of Sloan Creek off the right-of-way, but do not constitute evidence they knew those soil conditions. *See City of Keller v. Wilson*, 168 S.W.3d at 830 (notice from a lawyer's letter to a city "may have required the City to investigate, but again is no evidence it knew" the truth of the matter asserted in the letter). There is, therefore, no basis in the record supporting Petefish's testimony, and therefore no evidence that NTTA and TxDOT knew, let alone should have known, from the bridge reports, pre-construction erosion of a detention pond, or the design of concrete riprap at the discharge point what Sloan Creek's soil composition was where it eroded or that the volumes of water discharged through the drainage system would cause that erosion.

Petefish testified to a conversation he had with Christie Glendinning, who appraised Sloan Creek II's property for the easement condemnation. Petefish testified he told Glendinning he was concerned about the impact of the Tollway project on the erosion of the creek and damage to a natural spring; that he did not want to lose a black walnut tree on the bank of the creek or the spring. Petefish testified Glendinning was an NTTA appraiser and that, "[h]aving told NTTA's appraiser about the erosion problems in Sloan Creek, NTTA knew or was substantially certain that Sloan Creek would experience significant erosion during, upon, and after completion of construction of the SH121/US75 project."

NTTA provided Glendinning's affidavit in which she testified that she was subcontracted through Pyles Whatley Corporation to provide independent fee appraiser service regarding NTTA as a potential buyer and Sloan Creek II as a potential seller. She testified, "As an independent fee appraiser, I had no financial or other interest in the property and was not associated with either the potential buyer (NTTA) or the potential seller (Sloan Creek)." Glendinning recalled Petefish's concern expressed to her being whether the Tollway project might cause a natural spring that fed Sloan Creek to cease flowing. She did not walk down into the creek bed and did not recall any discussion with Petefish regarding flooding or erosion. Glendinning did not recall discussing flooding or erosion with anyone at NTTA. NTTA also provided Bouma's affidavit, its lead engineer, in which he testified he did not recall any conversation with Glendinning regarding potential flooding or erosion of Sloan Creek and he was Glendinning's primary point of contact at NTTA.

There is no evidence in this record that what Petefish testified he told Glendinning about erosion was ever reported to NTTA and, if it had been, that it would have been enough. Glendinning and Bouma testified Glendinning never mentioned Petefish's "concerns" about

erosion of Sloan Creek, and there is no evidence to controvert their testimony. Glendinning testified that as an independent fee appraiser, she "was not associated with either the potential buyer (NTTA) or the potential seller (Sloan Creek)," which Sloan Creek II does not challenge with controverting facts. Nor does Sloan Creek II argue with record cites and supporting authorities that Glendinning's knowledge should be imputed to NTTA or TxDOT.[16] And even if Glendinning informed NTTA of Petefish's concerns about erosion, that at most would have been information NTTA should have investigated, but does not constitute evidence NTTA knew there was any erosion potential from the design of the Tollway. *See Wilson*, 168 S.W.3d at 830. Accordingly, Petefish's testimony about his statements to Glendinning does not create a factual dispute about NTTA's knowledge of erosion potential from the design of the Tollway.

### g. *Sloan Creek II's Counsel's Notice to NTTA of Erosion*

Sloan Creek II relied on its counsel's affidavit that at an unidentified time before January 7, 2011, he informed counsel for NTTA that Petefish "had observed significant erosion in Sloan Creek since the SH121/US75 project," that Petefish's "expert opinion was that the project had caused the erosion he had observed in Sloan Creek," and that Walton "had determined that the flash-flood conditions present in Sloan Creek during moderate rain events was a direct result of the project." Counsel testified the conversations occurred at least two months prior to NTTA's stated completion date of March, 2011, for the project. NTTA provided aerial photographs and testimony from Bouma as evidence that all new underground drainage components were installed and operational and the construction plans for the project were completed no later than July 15, 2010. Bouma further testified that the southwest detention pond was completed or substantially completed by December 14, 2010.

---

[16] We have already decided the trial court did not abuse its discretion in sustaining NTTA's and TxDOT's objections to Petefish's speculative and conclusory testimony that simply assumed or treated Glendinning as an employee of either NTTA or TxDOT.

Sloan Creek II's counsel's communication to NTTA's counsel in January 2011 occurred after the design and construction of the project was completed, at least as to those aspects that allegedly caused the erosion of which Sloan Creek II complains. Sloan Creek II's counsel's communication to NTTA's counsel stated the client's complaint about erosion in the past tense; that the Tollway improvements "had" caused erosion to occur. This is corroborated by NTTA's and TxDOT's evidence that the design and construction of the roadways comprising the interchange were completed in July 2010 and the last item to be constructed that Sloan Creek II complains contributed to the erosion, the detention pond, was completed at least by early December 2010. Sloan Creek II provided no evidence there was any design or construction that occurred after its counsel's communication to NTTA's counsel that caused or contributed to the erosion of which Sloan Creek II complains.

A mere demand from a lawyer may require a governmental entity to investigate, but is not itself evidence the governmental entity knew the facts asserted were substantially certain to be the case. *See Wilson*, 168 S.W.3d at 829–30 (lawyer's letter insufficient to create a fact issue governmental entity knew its conduct was substantially certain to damage owner's property); *cf. Hall*, 433 S.W.3d at 724–27 (property owner conveyed detailed information to city manager, director of public works, and other city officials that supported conclusion governmental entity knew its conduct was substantially certain to cause damage alleged to be a taking). So counsel's notice to NTTA at most provided information NTTA should have investigated. But even if Sloan Creek II's counsel's communication to NTTA's counsel was sufficient to create knowledge that NTTA's and TxDOT's conduct was substantially certain to cause the erosion of Sloan Creek, it could be effective only for conduct thereafter of which there is no allegation or evidence. *See Pollock*, 284 S.W.3d at 821 (governmental entity's knowledge measured at time of conduct alleged to cause taking or damage).

> h. *Argument from Circumstantial Evidence Does Not Close Gaps in Petefish's and Walton's Testimony About NTTA's and TxDOT's Knowledge*

Sloan Creek II argues that circumstantial evidence supports inferences in its favor.[17] Petefish's and Walton's opinions that are speculative and conclusory cannot be made legitimate by treating the speculative statements as legitimate inferences. As discussed in detail above, the record is devoid of evidence that NTTA's and TxDOT's employee-engineers or the consulting engineers had knowledge of the underlying facts on which Walton and Petefish base their opinions. Sloan Creek II does not provide argument regarding what facts the engineers knew from which favorable inferences should be drawn. There must be more than "meager circumstantial evidence" or "evidence [that] does not rise above a scintilla" otherwise "jurors would have to guess whether a vital fact exists." *Wilson*, 168 S.W.3d at 813. As indicated by the conflict between the inferences Petefish drew from the soil data on the right-of-way and the inferences Delphia and Hopfe drew, "'[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred.'" *Id*. (quoting *Tubelite*, 819 S.W.2d at 805). So even if we assumed Petefish and Walton provided an adequate basis for opining about what the consulting engineers and NTTA's and TxDOT's employee-engineers should have known from a given set of facts, for the reasons stated above the record still lacks a factual basis that the engineers actually had or actually knew the necessary information in order to draw the inferences favorable to Sloan Creek II's view of the facts. A factfinder could only guess at any inference to draw from the evidence Sloan Creek II presented; it is too meager; it is legally insufficient. *Id*.

---

[17] Sloan Creek II also argues intent must always be submitted to a jury because intent is often proven by circumstantial evidence from which intent is inferred. Where no evidence supports a finding of intent, the supreme court has concluded intent can be decided as a matter of law. *See Pollock*, 284 S.W.3d at 821 (no evidence of intent supported jury verdict, so supreme court rendered judgment); *Holland*, 221 S.W.3d at 643 (no intent as matter of law required dismissal of case on plea to jurisdiction); *Wilson*, 168 S.W.3d at 831 (no evidence of intent required reversal of jury verdict and rendition of judgment); *State Farm Lloyds*, 145 S.W.3d at 168 (same); *Jennings*, 142 S.W.3d at 314–15 (summary judgment correctly granted because no evidence of intent).

Accordingly, there is no evidence in this record from which inferences can be drawn in favor of Sloan Creek II's position that NTTA and TxDOT knew the designed discharge of rainwater runoff into Sloan Creek would unnaturally erode the banks of Sloan Creek.

## CONCLUSION

We conclude NTTA and TxDOT established they did not know the Tollway project was substantially certain to erode the banks of Sloan Creek at all, or that any erosion would be greater than the natural erosion or occur at a greater rate as Sloan Creek II claims. Further, Sloan Creek II has not shown on this record a factual controversy exists regarding NTTA's and TxDOT's knowledge.[18] Because such knowledge is necessary to establish NTTA's or TxDOT's liability under article I, section 17, of the Texas Constitution, NTTA and TxDOT established Sloan Creek II does not have a state law takings or damages claim. Accordingly, the trial court did not err when it dismissed Sloan Creek II's counterclaim for inverse condemnation under article I, section 17, of the Texas Constitution.[19]

---

[18] We, therefore, express no opinion here on the proper outcome under *Jennings* and its progeny of a case containing record evidence that the governmental entity willfully disregarded a risk of damage to private property resulting from a public project.

[19] Sloan Creek II does not challenge NTTA's and TxDOT's assertion that if Sloan Creek II's counterclaim does not state an inverse condemnation claim then its claim is subject to TxDOT's sovereign immunity and NTTA's governmental immunity. *See Pollock*, 284 S.W.3d at 821 ("Since there was no evidence of a compensable taking, the City is immune from the Pollocks' property damage claims."); *see also Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 702 n.3 (Tex. 2003) (distinction between sovereign and governmental immunity).

For the reasons stated above, we overrule Sloan Creek II's first, second, and third issues and part of its fourth issue. On this record, we need not reach the remainder of Sloan Creek II's arguments or NTTA's and TxDOT's arguments. We affirm the trial court's dismissal of Sloan Creek II's counterclaim against NTTA and TxDOT for inverse condemnation under article I, section 17, of the Texas Constitution.[20]


/ David Evans/
DAVID EVANS
JUSTICE


Fillmore, J., concurring

141456F.P05

---

[20] Because the pleas to the jurisdiction did not address Sloan Creek II's claims for inverse condemnation under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 and the trial court's order did not address those claims, those claims are not before us and we leave them undisturbed.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SLOAN CREEK II, L.L.C., Appellant

No. 05-14-01456-CV     V.

NORTH TEXAS TOLLWAY
AUTHORITY and THE STATE OF
TEXAS, Appellees

On Appeal from the County Court at Law
No. 6, Collin County, Texas
Trial Court Cause No. 006-3356-2008
Opinion delivered by Justice Evans, Justices
Fillmore and Myers participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's orders granting appellees' pleas to the jurisdiction and dismissing appellant's counterclaim under article I, section 17 of the Texas Constitution.

It is **ORDERED** that appellees North Texas Tollway Authority and the State of Texas recover their costs of this appeal from appellant Sloan Creek II, L.L.C.

Judgment entered this 28th day of August, 2015.